### In re Maurice B. FALL and Meredith D. Fall, Debtors.

**Bankruptcy No. 685–07198–W7.**

United States Bankruptcy Court,
D. Oregon.

Nov. 21, 1988.

---

**1.** *In re Nielson Skyline Farms,* 86 IBCR 168.

**2.** *In re Martin,* 761 F.2d 472 (8th Cir.1985).

G. Jefferson Campbell, Jr., Medford, Or., for trustee.

David B. Mills, Eugene, Or., for creditor.

Ronald C. Becker, Medford, Or., for debtors.

## MEMORANDUM OPINION

POLLY S. HIGDON, Bankruptcy Judge.

This court is required again to address an area of the law of bankruptcy which many judges enter with trepidation but which holds understandable continuing in-

terest to attorneys—the allowance of attorney's fees.[1]

I must decide two separate fee questions:

1. Should the trustee's attorney be awarded a fee enhancement (or bonus) under 11 U.S.C. § 330(a)(1) for work he has done in this Chapter 7 case; and

2. Should a creditor be awarded its expenses and attorney's fees incurred as an administrative expense pursuant to the provisions of 11 U.S.C. § 503(b)(3)(B) or (C) and (4)?

The debtors have objected to the trustee's application for bonus in entirety and to the creditor's application for the period April 5, 1985 to March 13, 1986.

After an evidentiary hearing I find the facts largely undisputed and are as follows:

The debtors filed their Chapter 7 bankruptcy petition on February 15, 1985. Their schedules indicated assets of $5,008.00 and liabilities of $1,135,093.00. They declared exempt assets of a value of $5,058.00. Thus this appeared from the schedules to be a no asset case. Gordon York, Inc., was appointed trustee. At the debtors' meeting of creditors a principal of a scheduled unsecured creditor (Centre 7) appeared with copies of deeds indicating transfers of several parcels of real property by the debtors to their in-laws pre-petition. Because of this information the trustee scheduled a debtors' Bankruptcy Rule 2004 examination. Counsel hired by Centre 7 on April 5, 1985 (Mr. Mills) took part in this exam of Mr. Fall (Ms. Fall had moved for a protective order excusing her due to ill health), did most of the questioning and asked about information reflected by the deeds and about significant real and personal property which appeared on a 1980 financial statement which Fall had previously given Centre 7 but which did not appear on the Falls' bankruptcy schedules.

The financial statement provided Centre 7 did not indicate debts owed by the Falls to in-laws (Jensens) in exchange for property transfers as Fall claimed at his 2004 exam. Therefore Centre 7 filed a § 523 complaint against Falls. This complaint put Falls in the position of either having to admit that they had omitted liabilities from the financial statement or had transferred properties without consideration. Meanwhile the Jensens, shown as grantees on the deeds, were represented by Fall as being unavailable for examination due to their absence from Oregon.

The trustee had no funds in the estate for expenses to investigate or litigate. In August, 1985 the Falls received their general discharge from their dischargeable debts. In October, 1985 Gordon York, Inc., resigned as trustee due to a conflict of interest and was replaced by Michael Grassmueck, Inc.

When Michael Grassmueck, Inc., became trustee Mr. Mills shared with Mr. Grassmueck what he knew about the status of the case and what he suspected about transfers of property from the Falls to third parties. The trustee believed Mills was pursuing something worthwhile and encouraged him to continue. He also used the information to approach Jefferson Campbell and ask his firm to represent the trustee. At that point the prospect of recovery of any assets for the estate was highly problematical. The estate would have to prove any consideration for transfers was inadequate and litigate under 11 U.S.C. § 544(b) rather than § 548 as any fraudulent transfers took place prior to one year before filing. At that point there were no records on which to rely but there was some indication of valid consideration for the transfers. In addition the estate still had no funds to pay fees and expenses. On the other hand, if the trustee were successful in bringing just the real property transferred back into the estate it was believed the estate would be augmented by an estimated $1.3 million. Mr. Campbell's

---

1. It was said in *Planned Parenthood v. State of Arizona*, 789 F.2d 1348, 1351–52 (9th Cir.1986), *aff'd sub. nom. Babbitt v. Planned Parenthood of Cent. & Northern Arizona*, 479 U.S. 925, 107 S.Ct. 391, 93 L.Ed.2d 346 (1986), that "looking over the shoulders of attorneys to examine their charges is not a task welcomed by judges.... Even though our competence to undertake this scrutiny is limited at best, we must assume the burden because at present no other bearer is available."

firm agreed to represent the trustee on an hourly basis and was so authorized by the court on November 12, 1985.

Meanwhile Mr. Mills had continued his investigation and discovered a promissory note for $12,400 in favor of Mr. Fall which was not listed on the bankruptcy schedules and which was recorded with the Josephine County clerk after the Falls received their bankruptcy discharge. In the fall of 1985 Mills moved the court for a Bankruptcy Rule 2004 exam of Mr. and Mrs. Jensen and Mr. Fall. The Jensens moved the court for a protective order asking they not be examined due to health problems. The court ordered the exam of all parties. Mr. Campbell met with Mr. Mills and decided to take part in the exams scheduled for November 21, 1985. Centre 7 paid the expense of these exams.

After two days of exams counsel were more hopeful of recovery on a theory of fraudulent transfer but recognized, due to Falls' and Jensens' lack of personal records and their shifting stories that it would be a time-consuming and expensive job to reconstruct the transfers. In early 1986 Campbell offered to allow recognition of Falls' debt to Jensens, if any, as secured in exchange for a return of the real property to the estate. Falls and Jensens rejected this offer. Campbell and Mills then agreed to divide the investigation responsibilities. Mr. Mills had previously tracked transfers of all real property owned by Falls through county indexes and obtained records for all corporations in which it was discovered Fall had an interest. As Falls had lived in Eugene, Oregon years earlier, where Mills lived, it was agreed he would track all transactions there by Fall and the corporations it was determined he had established. Campbell focused on the flow of funds around the real properties in Grants Pass, Oregon. Most of the properties were rentals and continued to generate income throughout the case. Centre 7 agreed to continue to pay for Mr. Mills' investigative expenses. Campbell was advancing his own costs.

Mills decided to abandon his § 523 complaint as the evidence was suggesting not

that Falls were poorer than represented but that they had more assets in 1985 than scheduled and § 523 settlement negotiations with the Falls' attorney had not progressed. In February, 1986 he drafted and filed a complaint to revoke discharge.

On February 27, 1986 Centre 7 moved for court authority under § 503(b)(3)(B) to proceed to attempt to recover assets for the estate. This court approved the application on March 12, 1986.

In April, 1986 Mr. Mills examined Fall's daughter, who lived in Eugene, about transfers of personal property from her father to herself and her alleged ownership of certain corporations. He also drafted a complaint to avoid fraudulent conveyances. He did not participate in any exams held by Campbell after early 1986. He kept pressure up for an early trial date on the complaint to revoke discharge. Around May, 1986 the trustee intervened in this proceeding. The Falls entered a stipulation agreeing to revocation of their discharge. As part of the stipulation Fall agreed to pay Centre 7 $10,000 to forbear legal proceedings until the bankruptcy case was completed. Mills held the funds pending the trustee's investigation of the source of the $10,000. When it became clear the funds were from an unscheduled contract receivable held by Fall Mills turned the funds over to the trustee. Mills' work ceased after the court signed the stipulated order revoking discharge on July 7, 1986 except for taking part in later settlement negotiations between the trustee and Falls.

As a result of the exams in late 1985 the trustee was concerned about what appeared to be Fall's continuing control over both the real property and the income flowing therefrom. Questions had also arisen about certain trusts which Falls might have established while in Josephine County. Campbell took many Bankruptcy Rule 2004 exams of third parties. He developed chains of title, traced money flows and examined tax records.

The trustee still had no funds with which to litigate. Campbell had not yet been paid anything for his work on behalf of the trustee. He had advanced expenses for the

estate. He had a one to two person law firm, was handling several other large bankruptcies for the trustee and had serious cash flow problems which required him to borrow from the bank to meet his payroll. Late in 1986 Campbell reviewed the complaint to avoid fraudulent transfers earlier drafted by Mills, researched further aspects of it and turned it over for further drafting and filing to an additional attorney appointed for the trustee in September, 1986, Mr. Alley. The trustee felt he needed even more time and money expended immediately on behalf of the estate to gain control of the assets. Mr. Alley was prepared also to work without pay initially and advance expenses.

In the spring of 1986 the debtors obtained new counsel (Mr. Smith). In May, 1986 Smith sent letters to Falls' creditors to determine the status of their claims and see if they would accept a discount for immediate payment. He talked to the Falls about the possibility of refinancing some real property to generate the funds needed to pay the creditors. In September, 1986 he also moved to dismiss the case. This motion was later withdrawn as part of settlement. On behalf of his clients he signed the stipulation to revocation of discharge. He negotiated a settlement with Alley of the fraudulent conveyance proceeding. These negotiations extended for some time. The trustee had learned Fall was trying to deal with his creditors directly and was concerned some creditors would agree to being paid off at a discount without knowing all relevant facts. The trustee had put a real property manager in place to manage the property but Fall kept exerting control over the properties. A settlement reached in late 1986 fell apart and another was reached in mid 1987.

Meanwhile Campbell had continued his investigation and in early 1987 discovered a Washington bank account which Fall had established pre-petition and which extended well into post-petition into which rent checks from the real property was flowing and out of which Falls were withdrawing for personal expenses. Campbell also investigated the accuracy of the liabilities listed on the schedules. In addition he pulled together information and prepared a report to the United States Attorney. In December, 1988 the U.S. Attorney will be convening a grand jury to review alleged bankruptcy crimes by Falls. He also assisted the trustee in the management and sale of certain real estate parcels and a business in which the debtors were found to have an interest.

In August 1987 this court approved a final settlement agreement in the fraudulent conveyance proceeding which provided for conveyance of certain parcels of real property and personal property to the trustee who would hold them pending payment by the Falls in full of all allowed unsecured claims against the estate (unless a creditor elected to receive less) and all allowed administrative claims. If all claims were paid the property would be returned to Falls.

### Mr. Campbell

This court has entered a series of orders approving interim compensation and expense for Campbell totalling $26,154.77 through July 28, 1988. He did not receive his first distribution of fees from the estate until May 13, 1987 when he received $3,273.38. Since then he has received the full amount approved. Campbell has requested this court establish a factor of not less than two to be applied to fees and expenses allowed and to be allowed as a bonus or fee enhancement for his work in this case.

The court has recited in some detail the facts of this case for several reasons. Even with the detail of the recitation it does not completely reflect the tremendous obstacles the trustee and his attorney overcame in achieving the optimum result described for Falls' creditors. Yet this court must conclude that the degree of difficulty of the case, the quality of representation, and the extent of the benefit to the creditors play no role in determining whether a bonus or enhancement should be awarded.

The history of the emergence of a proper standard by which to determine attorney's fees in bankruptcy reflects some confusion

and the development of this standard is not complete. In *In re Yermakov*, 718 F.2d 1465 (9th Cir.1983), the Ninth Circuit Court of Appeals adopted the so-called "lodestar" test as the primary method for determining reasonable fees under 11 U.S.C. § 330(a)(1). The lodestar calculation is performed by multiplying the number of hours expended by an hourly rate. The hourly rate must be based on rates charged for comparable services in non-bankruptcy cases. *Id.* at 1471. In determining a reasonable rate the bankruptcy court should examine both the rates charged by the individual firm and rates charged in the area. The *Yermakov* court referred to the 12 factor test for determining attorney's fees earlier enunciated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–719 (5th Cir. 1974)[2] only through a passing cite reference. *Id.*

The next year in *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), the United States Supreme Court, enunciated guidelines to determine reasonable fees under the Civil Rights Attorney's Fees Award Act of 1976 (42 U.S.C. § 1988). It stated: "The initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.... Adjustments to that fee then may be made as necessary in the particular case." *Id.* at 888, 104 S.Ct. at 1544. It held that the "novelty and complexity of the issues," the "quality of representation," the "results obtained" and "special skill and experience of counsel" were all presumably reflected in the lodestar amount and "normally should not provide an independent basis for increasing the fee award." *Blum*, 465 U.S. at 898–900, 104 S.Ct. at 1550. It stated an upward adjustment to lodestar should be limited to rare and exceptional cases. *Blum*, 465 U.S. at 897, 901, 104 S.Ct. at 1550. After *Blum*, within the context of the determina-

tion of reasonable fees under a fee-shifting statute like 42 U.S.C. § 1988, the *Johnson* factors which the United States Supreme Court held were appropriately to be considered had shrunk significantly.

The *Blum* court did not decide whether the risk of not prevailing (the element of contingency) (a *Johnson* factor) was a proper basis upon which an increase above lodestar might be based. The next year the Ninth Circuit Court of Appeals, in determining fees under 42 U.S.C. § 1988, held, under the precepts of *Blum* and *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), both the risks of not prevailing and a delay in payment might justify an upward adjustment to the lodestar fee. *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1212 (9th Cir. 1986).

In 1986 the United States Supreme Court issued *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (*Delaware I*). In *Delaware I* it was determining a fee award under another fee-shifting statute, the Clean Air Act, 42 U.S.C. § 7401 *et seq.* The court first held it would interpret the attorney's fee provision of the Clean Air Act like that provision in the Civil Rights Act. Generally, it rejected application of the *Johnson* factors to determine fees as "subjective," producing "disparate results." *Id.* at 563, 106 S.Ct. at 3097. It held overall quality of performance should not "ordinarily" be used to adjust the lodestar. *Delaware I*, 478 U.S. at 566, 106 S.Ct. at 3099. "In short, the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee...." *Id.* It did not then decide the question of whether an upward adjustment for the risk of loss was appropriate.

**2.** The twelve factors are: (1) The time and labor required, (2) The novelty and difficulty of the questions, (3) The skill requisite to perform the legal service properly, (4) The preclusion of other employment by the attorney due to acceptance of the case, (5) The customary fee, (6) Whether the fee is fixed or contingent, (7) Time limitations imposed by the client or the circumstances, (8) The amount involved and the results obtained, (9) The experience, reputation, and the ability of the attorneys, (10) The undesirability of the case, (11) The nature and length of the professional relationship with the client, and (12) Awards in similar cases.

In *In re Powerine Oil Co.*, 71 B.R. 767 (Bankr. 9th Cir.1986) the Bankruptcy Appellate Panel reviewed *Yermakov, Chalmers, Hensley, Blum* and *Delaware I.* In adopting the guidelines enunciated in those cases for determining fees the court stated:

> The calculation of attorney's fees in bankruptcy matters is now analogous to that performed in other areas of the law. Accordingly, this Court will utilize the terminology and reasoning of those non-bankruptcy determinations to provide consistency in the application of the various factors and the results achieved.

*Id.* at 771 n. 3.

The court approved the award of 1.5 enhancement to the lodestar amount for the risk of loss undertaken by counsel despite the absence of a contingency fee agreement.

*Powerine* was decided before *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (*Delaware II*). In *Delaware II* the court issued a 4–1–4 opinion. A four person plurality first, with little discussion, held that adjustments in fees for delays in payment arising because of the contingent nature of the undertaking are appropriate. *Id.* 107 S.Ct. at 3081–3082. However, it rejected enhancement on the basis of risk of loss.

> It may be that without the promise of risk enhancement some lawyers will decline to take cases; but we doubt that the bar in general will so often be unable to respond that the goal of the fee-shifting statutes will not be achieved. In any event, risk enhancement involves difficulties in administration and possible inequities to those who must pay attorney's fees; and in the absence of further legislative guidance we conclude that multipliers or other enhancement of a reasonable lodestar fee to compensate for assuming the risk of loss is impermissible under the usual fee-shifting statutes.

*Delaware II,* 107 S.Ct. at 1387.

They further indicated that if the fee shifting statute were construed to permit such an enhancement as a general rule an upward adjustment should not exceed one-third of the lodestar. "Any additional adjustment would require the most exacting justification." *Delaware II,* 107 S.Ct. at 1389.

In a concurring opinion Justice O'Connor held that an enhancement for the risk of loss was not appropriate in that particular case. But she joined the four person dissent in holding that risk of loss is an appropriate factor to consider in setting a reasonable fee.

Since *Delaware II* several circuits have adopted the prerequisites identified by Justice O'Connor which must be met if an enhancement to a fee award is to be made for risk of loss.[3] The most recent of those is the Ninth Circuit in *Fadhl v. City and County of San Francisco*, 859 F.2d 649 (9th Cir.1988). These prerequisites are:

1. The fee applicant must establish that "without an adjustment for risk the prevailing party 'would have faced substantial difficulties in finding counsel in the local or other relevant market.'" *Fadhl,* at 650, citing, *Delaware II,* 107 S.Ct. at 3091.

2. The enhancement must be based on "the difference in market treatment of contingent fee cases *as a class,* rather than ... the 'riskiness' of any particular case." *Fadhl,* at 650–651, citing, *Delaware II,* 107 S.Ct. at 3089 (emphasis in original). "The fee applicant bears the burden of proving the degree to which the relevant market compensates for contingency." *Fadhl,* at 650, citing, *Delaware II,* 107 S.Ct. at 3090.

This court had concerns about the extent to which decisions establishing standards for determining reasonable fees under fee-shifting statutes should be followed in defining reasonable fees under 11 U.S.C. § 330(a)(1). As pointed out in *In re Baldwin–United Corp.,* 79 B.R. 321 (Bankr.S.D. Ohio 1987), an analysis of the statutory

---

**3.** *Save Our Cumberland Mountains, Inc. v. Hodel,* 826 F.2d 43, 53 n. 6 (D.C.Cir.1987); *Blum v. Witco Chemical Corp.,* 829 F.2d 367, 379 & n. 11 (3rd Cir.1987); *Spell v. McDaniel,* 824 F.2d 1380,

1404 & n. 23 (4th Cir.1987); *Crumbaker v. Merit Systems Protection Board,* 827 F.2d 761 (Fed.Cir. 1987).

purposes of the fee-shifting statutes and the bankruptcy statutes and knowledge of the practical context within which fees are awarded in bankruptcy may suggest that uniform adherence to such standards does not best suit the needs of the bankruptcy system. This question, however, has been resolved recently for the Ninth Circuit in *In re Manoa Finance Company*, 853 F.2d 687 (9th Cir.1988). The court concluded that 11 U.S.C. § 330 and fee-shifting statutes "are sufficiently similar to justify applying the same general principles for fee enhancements." *Id.* at 691. It did recognize as legitimate the concerns expressed in *Baldwin–United* regarding the uniqueness of the bankruptcy fee structure. Thus it directed that

> "[i]n order to justify a bonus [the applicant] must come forward with specific evidence showing why the results obtained were not reflected in either his standard hourly rate or the number of hours allowed. He must also show that the bonus is necessary to make the award commensurate with compensation for comparable non-bankruptcy services."

*Manoa*, 853 F.2d at 692.

■ The fee applicant bears the burden of proving an adjustment is necessary to the determination of a reasonable fee. *Hensley v. Echerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). This court believes this case has been rare and exceptional. Solely through the work of the attorneys, without estate funds to finance their effort, the attorneys have obtained for the estate real and personal property of a value of approximately $1.1 million. All unsecured creditors, who on the basis of the bankruptcy schedules filed would have received nothing, will potentially be paid in full.[4] This has been accomplished despite what appears to be very active pre- and post-petition efforts by the debtors to conceal assets. In addition the trustee's attorney has taken what is in this state the unusual step of encouraging the U.S. Attorney to investigate the debtors' activities and prepared a report in aid of that undertaking. This was done in the face of general knowledge that alleged bankruptcy crimes are rarely prosecuted.

■ This court believes an enhancement is appropriate to Mr. Campbell's fees for delay in payment. In discussing delay in payment the *Delaware II* dissent suggests it is appropriate to consider the economic risks of a particular attorney's circumstances. *Id.* Campbell has presented ample evidence of the dangers he faced to his firm's cash flow and in fact thereafter experienced in accepting this employment.

This enhancement for delay in payment will apply only to the total fees awarded in this case and not the expenses. I have calculated the amount Campbell's firm would have received if there had been no delay in payment by adjusting the hourly rates charged (which I have previously found reasonable) to reflect the increase in rates from the time an application was approved to the time the firm actually received payment for the approved fees. Mr. Campbell charged $85 per hour through December 31, 1986. His hourly rate increased to $90 per hour from January 1, 1987 to June 10, 1988 and to $95 per hour from June 11, 1988 to present. The calculations are as follows:

| Date Application Approved | Date Payment Received | Adjustment |
| --- | --- | --- |
| 10–29–86 | 05–13–87 | 37.6 hrs × $5 = $188.00 |
| 07–15–86 | 08–26–87 | 33.3 hrs × $5 = $166.50 |
| 08–05–87 | 08–26–87 | None—same hourly rate |
| 07–24–87 | 08–26–87 | None—same hourly rate |
| 10–21–87 | 10–22–87 | None—same hourly rate |
| 11–13–87 | 11–17–87 | None—same hourly rate |
| 03–22–88 | 03–22–88 | None—same hourly rate |

**4.** Priority claims of $898.79 and general unsecured claims of $147,307.41 are scheduled.

07–28–88  07–29–88  None—same hourly rate
10–11–88  Not yet received

---

11 U.S.C. § 328 and Bankr.R. 2014 authorize the employment of professionals on a contingency fee basis.[5] But in this state the trustee's general counsel customarily is hired on an hourly fee arrangement, as in this case. Because this professional is compensated from the assets of the estate he represents however, his assurance of any payment is regularly contingent upon the extent of those assets. It is this risk of non-payment, rather than the agreed form of compensation,[6] which makes many bankruptcy cases "contingent" within the context of this discussion.

A bankruptcy professional's fee may be augmented for this risk in a rare and exceptional case if he can prove he meets the O'Connor prerequisites established in *Delaware II* and the additional standards enunciated in *Manoa*. Mr. Campbell did not meet his burden of proof on this point. Most of the evidence presented at the hearing on the fee application attempted to demonstrate the difficulties overcome in *this particular case*. There was one exception. A local attorney testified as to the customary contingency fees charged in the area for non-bankruptcy collection cases. This is relevant information within the *Manoa* prerequisites. With regard to the *Delaware II* prerequisites, the market measurement (Title VII cases in San Francisco) followed in *Fadhl* to determine whether prerequisite number two had been met suggests that Mr. Campbell was required to demonstrate what return is expected by Medford area lawyers in the event they agree to represent a bankruptcy trustee in a Chapter 7 case. Nor was any evidence presented addressing prerequisite number one. Therefore the court must deny any enhancement on the basis of risk of loss. Mr. Campbell shall be awarded $354.50 additional fees.

### Centre 7

At the time of filing Centre 7 was listed in the debtors' schedules as the largest unsecured creditor. It filed a timely proof of claim for $55,790.73. It is requesting allowance of its expenses and attorney's fees incurred in the respective amounts of $2,064.35 and $11,646.00 from April 5, 1985 through June 15, 1986. It submits allowance is authorized by the provisions of 11 U.S.C. § 503(b)(3)(B) and (4) and 11 U.S.C. § 503(b)(3)(C) and (4). These sections state:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

(B) a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor;

(C) a creditor in connection with the prosecution of a criminal offense relating to the case or to the business or property of the debtor;

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and

---

5. The distinction between contingency fee arrangements and contingency adjustments to compensate for the risk of non-payment is recognized by the court in *Blum*. *Blum*, 465 U.S. at 903, 104 S.Ct. at 1551. One is not related to the other. In the former the fee is directly proportional to the recovery. The latter is an adjustment to "reflect the risk that no fee will be obtained." It is the latter contingency with which the court is concerned in determining proper fee awards under fee-shifting statutes.

6. The impact of the agreed *form* of payment to professionals in the bankruptcy context is of less importance than in non-bankruptcy areas because, regardless of the nature of the agreement, the court has the responsibility to review all awards and will reduce them if found "to have been improvident in light of developments...." 11 U.S.C. § 328(a).

the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant.

11 U.S.C. § 503(b)(3)(B) & (C), and (b)(4).

■ The burden is on Centre 7 to demonstrate it has incurred an administrative expense contemplated under § 503(b)(3) and (4). This includes proof that any expenses were actually incurred and necessary and any fees are reasonable.[7]

■ Often a creditor will possess both knowledge and resources which, if applied properly, could benefit the estate. The language of § 503(b)(3) reveals a policy of encouraging creditors to do so. If a creditor is found to be otherwise entitled to an administrative expense priority under § 503(b)(3) his motive is of no consequence.

### 503(b)(3)(B)

■ A portion of § 64(a)(1) of the Bankruptcy Act is a precursor of this subsection. There is one noteworthy exception. Section 64(a)(1) did not specifically require prior court approval be given a creditor for recovery of property. When Congress passed § 503(b)(3) it followed case law developed under § 64(a)(1) which recognized the necessity of establishing a mechanism to assure that efforts are not duplicative and costs are not excessive and counterproductive. A minority of courts has allowed expenses under § 503(b)(3) where prior court approval has not been obtained. This court believes that because the statutory mandate of § 503(b)(3)(B) is clear and, more importantly, because it views early court control as wise, it will not allow expenses under that subsection without prior court approval.[8]

■ There is nothing in the language of former § 64(a)(1) of the Bankruptcy Act nor in the legislative history of § 503(b)(3)(B) to suggest that only a creditor's expense incurred in actual litigation which results in recovery of property is allowable under § 503(b)(3)(B). This court believes to construe the statutory language so narrowly would undercut the very policy of creditor encouragement which the statute reflects. The more difficult question is what creditor's acts "recovery of property" should encompass.

■ Section 64(a)(3) of the Act allowed a creditor to recover his expenses in successfully preventing the debtor's discharge. Although there is case law to the contrary this court believes that to include expenses incurred in opposing discharge (whether successfully or unsuccessfully) is to ignore Congress' decision, in promulgating the Bankruptcy Code, to eliminate this Act subsection. Further, the adjectives "transferred or concealed" indicate clearly an intent that there be actual recovery of a specified type of property for the court to approve allowance under the subsection.

### 503(b)(3)(C)

■ Another portion of § 64(a)(3) is the precursor of § 503(b)(3)(C). The language of § 503(b)(3)(C) is broader than that of its predecessor, § 64(a)(3) of the Bankruptcy Act in that it does not require information provided by the creditor to result in a conviction. It is unclear from the langauge the extent to which or how directly a creditor's actions must contribute to the prosecution. The phrase "in connection" could encompass a wide variety of activities. Its use suggests a legislative intent that a creditor whose activities can be shown to have contributed in any direct way to the results which led to prosecution of a criminal offense, whether or not resulting in conviction, may have its expenses allowed.

---

7. This court believes a court should calculate the reasonableness of fees under § 503(b)(4) by applying the guidelines reiterated herein for determining fees under § 330(a)(1).

8. Centre 7 in 1986 did not request and is not now requesting the court for an order retroactively approving its expenses incurred prior to February 27, 1986. Considering the purpose promoted by the requirement of prior court approval such orders are not appropriate even if rarely granted under other circumstances.

Without the intervention of Centre 7 it is quite possible this would have been administered as a no-asset case. All investigations made, information revealed, litigation filed and prosecution pursued were the result of Centre 7's early and forceful intervention and its willingness to fund continued inquiry. The trustee's attorney's diligent and tireless effort which also greatly contributed to the recovery of assets and prosecution of a criminal offense against the debtor should not detract from Centre 7's contribution. Much of Centre 7's work was done before the trustee's attorney had been retained or had sufficient knowledge to take over the investigations. Even after Mr. Campbell went into "high gear" there was little duplication of effort because the attorneys split the geographical territory and duties.

The court finds it cannot approve Centre 7's expenses incurred from April 5, 1985 to February 27, 1986 [9] under § 503(b)(3)(*B*) because they were incurred without prior court approval. I will allow expense incurred from April 5, 1985 to February 27, 1986 under § 503(b)(3)(*C*) with the exceptions described below. Further, I will allow expense incurred *after* February 27, 1986 under both § 503(b)(3)(B) and (C) again with the exceptions described below. Pursuant to § 503(b)(4) fees are allowed to the extent expenses under § 503(b)(3)(B) and (C) are allowed.

There are some exceptions to the allowance. Filing and pursuit of both the § 523 action and the complaint to revoke discharge, although having added to the general, continual, pressure on the Falls which led to the positive results obtained for the estate, have no connection with the prosecution of a criminal defense and did not, more than tangentially, play a role in the recovery of estate property. I will not allow expenses or fees incurred for these purposes.

Mr. Mills' hourly rate was $70 and $80, well within, if not below, rates in the community for non-bankruptcy work. I have reviewed Mills' fee application and find that the hours charged for the work done which is explained in sufficient detail to approve are reasonable for those fees which reflect allowed expenses. Some time entries contain insufficient information of the work performed and are not allowed.

Those fee entries disallowed under § 503(b)(4) are:

| Date | Description | Amount |
| --- | --- | --- |
| 04/29/85 | Draft Proof of Claim | $ 28.00 |
| 05/20/85 | Research Deeds & Records w/Stater Re: Obj. to Discharge & Review of Docs. | $ 70.00 |
| 05/21/85 | Draft Complaint Obj. to Discharge | $ 28.00 |
| 05/31/85 | Prepare Cover Sheets; File Complaint | $ 21.00 |
| 05/31/85 | Deliver Complaint to Stater; Discuss Case | $ 14.00 |
| 06/06/85 | Letter to Mildenstein Re: Complaint | $ 14.00 |
| 09/17/85 | Phone: Court Pre-trial Hearing | $ 14.00 |
| 12/23/85 | Research Re: Compensation to Trustee | $ 40.00 |
| 12/28/85 | Review Proof of Claim; Research Interest, Proofs of Claim; Letter to Blackhurst; Draft Notice; Draft Subpoena; Letter to Mildenstein | $ 176.00 |
| 01/20/86 | Review of Discharge | $ 48.00 |
| 02/15/86 | Draft Complaint; Letter; Draft Confession of Judgment; Draft Complaint | $ 480.00 |
| 02/25/86 | Draft Motions | $ 64.00 |
| 02/26/86 | Draft Summons | $ 16.00 |
| 02/26/86 | Draft Petitions and Affidavit | $ 64.00 |
| 02/26/86 | Phone: Client | $ 16.00 |
| 02/26/86 | Deliver Complaint and Motions | $ 16.00 |
| 02/26/86 | Phone: Court | $ 16.00 |
| 05/08/86 | Phone: Campbell | $ 16.00 |
| 05/21/86 | Phone: Blackhurst | $ 16.00 |
| 05/26/86 | Review Documents | $ 40.00 |
| 05/26/86 | Prepare Letter | $ 16.00 |
| 05/28/86 | Review File; Draft Request for Production | $ 256.00 |
| 05/28/86 | Phone: Court | $ 16.00 |
| 05/28/86 | File Request | $ 24.00 |
| 05/20/86 | Phone: Court | $ 16.00 |
| 05/20/86 | Phone: Campbell | $ 16.00 |
| 06/03/86 | Phone: Sande | $ 16.00 |
| 06/03/86 | Court Appearance: PTC | $ 40.00 |
| 06/03/86 | Phone: Blackhurst | $ 24.00 |
| 06/06/86 | Phone: Blackhurst | $ 16.00 |
| 06/06/86 | Phone Conference: Blackhurst & Smith | $ 48.00 |
| 06/07/86 | Phone: Neal | $ 16.00 |
| 06/07/86 | Draft Order | $ 16.00 |
| 06/07/86 | Letter to Smith | $ 16.00 |
| 06/15/86 | Letter to Blackhurst | $ 16.00 |
| | TOTAL | $1,733.00 |

All expenses listed are found to have been actually incurred and, if not for the

9. It is this court's procedure to make court orders authorizing professional employment retroactively effective to the date the application was filed with the court. This procedure is also appropriate here; the application was filed February 27, 1986.

exceptions noted, necessary to the ongoing investigation.

Those expenses disallowed under § 503(b)(3)(B) and (C) are:

| Date | Description | Amount |
|------|-------------|--------|
| 02/26/86 | Costs Advanced | $60.00 |
| | TOTAL | $60.00 |

Mr. Mills is allowed fees in the amount of $9,913.00 and expenses in the amount of $2,004.35.

This memorandum opinion contains the court's findings of fact and conclusions of law and pursuant to Bankruptcy Rule 9014, which incorporates Rule 7052, they will not be separately stated.

An order consistent herewith shall be entered.

### ORDER ALLOWING FEES AND GRANTING ADMINISTRATIVE EXPENSES

The court, having entered its memorandum opinion in these proceedings, and based thereon,

IT IS HEREBY ORDERED that G. Jefferson Campbell, Jr., the trustee's attorney, shall be allowed $354.50 in additional fees under 11 U.S.C. § 330(a)(1); and

IT IS FURTHER ORDERED that Centre 7 shall be granted its administrative expense claim for attorney's fees and expenses under 11 U.S.C. §§ 503(b)(3)(B), 503(b)(3)(C) and 503(b)(4) in the amount of $9,913.00 for fees and $2,004.35 for expenses.