In re ONE CITY CENTRE ASSOCI-
ATES, A California Limited
Partnership, Debtor.

Bankruptcy No. 286–00521–B–11.
Motion Nos. JLL–1, JLL–2, MJC–500.

United States Bankruptcy Court,
E.D. California.

Feb. 27, 1990.

Hefner, Stark & Marois by Ronald H. Sargis, Sacramento, Cal., for Sara Faustman, Ltd. Partner of One City Centre Associates.

Howard, Rice, Nemerovski, Canady, Robertson & Falk by James L. Lopes, San Francisco, Cal., for Melvyn J. CoBen, Trustee.

Stein, Lubin & Lerner by Judith C. Radcliffe, San Francisco, Cal., for Secured Creditor United Sav. Bank, F.S.B.

Trainor, Robertson, Smits & Wade by Nancy Hotchkiss, San Francisco, Cal., for the Equity Sec. Holders' Committee.

Melvyn J. Coben, Sacramento, Cal., trustee.

## MEMORANDUM DECISION

DAVID E. RUSSELL, Bankruptcy Judge.

Because the above-referenced motions revolve around substantially similar facts and involve the performance of a single individual, namely, Melvyn J. CoBen, as the Chapter 11 Trustee, and the law offices of Melvyn J. Coben, as general counsel for the Trustee, they have been consolidated for the purposes of this decision.

The pertinent issues are straightforward: 1) Are the fees and costs set forth in the respective applications for attorney fees (Motions JLL–2, MJC–500) reasonable, actual, and necessary as required by 11 U.S.C. § 330)(a)? 2) Do the circumstances of the case merit an enhancement of those fees and, if so, to what extent? 3) Under the circumstances of the case, is the compensation requested by the Trustee "reasonable" pursuant to 11 U.S.C. § 326(a)? All relevant and admissible evidence of record having been considered, the court now renders the following decision.

## STATUS OF APPLICATIONS

1) The above-entitled voluntary Chapter 11 bankruptcy case was commenced on January 31, 1986.

2) The court approved the interim appointment of Melvyn J. CoBen (hereinafter "Applicant") as Trustee for the Debtor-in-Possession, One City Centre Associates (hereinafter "Debtor") on January 31, 1986. Applicant's appointment as Trustee was made permanent by order of this court on June 9, 1986. To date, Applicant has not received any compensation for the services rendered in his capacity as Trustee.

3) The Equity Security Holders Committee has alleged that there was an agreement between Mr. CoBen and the Debtor's general partners prior to his appointment as Trustee that his compensation both as Trustee and general counsel would be at a set rate per hour, with a bonus to be paid only if he successfully defeated certain claims against the estate in toto. The court finds the allegations to be incredible (especially in light of 18 U.S.C. § 155 which renders such agreements criminal), and the supporting declaration of James Kassis unbelievable. The allegations were otherwise unfounded in fact and unsupported by the evidence.

4) Applicant was appointed as general counsel to the Trustee on March 18, 1986. To date, Applicant as general counsel has received $138,379.50 in authorized fees and

costs from the bankruptcy estate for services rendered between January 31, 1986 and May 31, 1987.[1] The hourly rate for the fees was $150 for 922.25 hours.

5) In motion no. JLL–2 Applicant seeks compensation for 7.75 hours of time spent on the case in November 1986 and April 1987 that was overlooked in his previously approved fee applications at the hourly rate of $150.00, or $1,162.50. He also seeks compensation for 106.85 hours from June 1, 1987 through April 27, 1989 at $175.00 an hour, or $18,698.75 in fees, and $61.06 in costs. Finally, he requests a $300,000.00 supplemental fee enhancement award for services rendered in his capacity as general counsel to the Trustee.

6) In motion no. MJC–500 Mr. CoBen requests that his law firm be paid $22,200 for 148 hours of his time (mostly in respect to preparing his fee applications for motions JLL–1 and JLL–2) at $150.00 an hour.

7) For his services as Chapter 11 Trustee, as set forth in motion no. JLL–1, Applicant seeks the sum of $702,536.00 ($35,126,-799.97[2] × 2%) as compensation. Although no specific time records were maintained, Applicant contends that he devoted approximately 300 to 400 hours as trustee administering this Chapter 11 case.

8) To date, all unsecured and secured claims against the estate have been satisfied in whole or as compromised. Approximately $825,000.00 remains in the Debtor-in-Possession's bank account for distribution to equity security holders and administrative claimants.[3]

## THE LODESTAR AND FEE ENHANCEMENTS

A determination of what constitutes "reasonable compensation" for the Chapter 11 trustee under 11 U.S.C. § 326(a) or for professionals employed by the estate under the provisions of 11 U.S.C. § 330(a) must generally be based upon "the time, the nature, the extent, and the value of the services rendered, and on the cost of comparable services other than in a case under the bankruptcy code." (H.R.Rep. No. 595, 95th Cong., 2d. Sess. 329–30, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6286). The judiciary, in determining what is reasonable compensation where such compensation is required by statute, has generally adopted the so-called "lodestar" concept. The lodestar, from an attorney's perspective, is the product of his or her normal hourly billing rate times the number of hours expended on the case. Since this method of determining an attorney's compensation is universally used in almost all types of ordinary cases handled by attorneys, it works reasonably well in the ordinary bankruptcy case, even though it engenders a seemingly disproportionate amount of time and effort by everyone concerned when the fees are contested. Not all cases are ordinary, however, and when courts and attorneys are confronted by the unusual case, the question arises as to whether the formula for computing reasonable compensation needs to be modified or changed. As should be expected, most fee applications citing the unusual case as justification seek a change or modification of the formula that would result in an enhancement of fees.

The Bankruptcy Code, of course, is not the only statutory scheme requiring the judiciary to define and thus determine what is reasonable compensation. The Supreme

1. The fees and costs were approved and payment authorized by orders dated 12/18/86 and 9/8/87.

2. The "$35,126,799.97" was derived from the Trustee's "Consolidated Report of Receipts and Disbursements, January 31, 1986 through December 31, 1988" which shows that $35,126,-799.97 has been disbursed or turned over by the Trustee to parties in interest to date. The court notes that a legal malpractice claim with an estimated "multi-million dollar settlement value" (Declaration of Melvyn J. Coben, filed 6/14/89, at p. 21, ¶ 30) has been filed on behalf of the estate against the law firm of Bronson, Bronson & McKinnon. Consequently, the amount ultimately collected and distributed by the Trustee may exceed $35,126,799.97.

3. As was noted above, because the estate is currently in the process of prosecuting a legal malpractice action against the law firm of Bronson, Bronson & McKinnon, the amount of funds which will remain at the close of the case for equity interest holders cannot now be accurately ascertained.

Court, in a series of recent cases involving federal fee-shifting statutes, has been fine tuning the lodestar concept in an effort to more precisely define what is reasonable compensation in the unusual case, as opposed to the ordinary case.

■ The beginning point for the trial court in calculating reasonable attorneys' fees in the unusual case is the same as in the ordinary case, which is to determine the lodestar amount by multiplying the number of hours *reasonably* expended on litigating the case times a *reasonable* hourly rate. The court may then analyze any unusual factors claimed by the fee applicant to justify an enhancement of the lodestar rate. (*Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air* (hereinafter "Penn I") 478 U.S. 546, 564, 106 S.Ct. 3088, 3097, 92 L.Ed.2d 439 (1986) [involving the Clean Air Act (42 U.S.C.S. § 7604(d)]; *Blum v. Stenson*, 465 U.S. 886, 888, 104 S.Ct. 1541, 1543, 79 L.Ed.2d 891 (1984) [involving the Civil Rights Attorney's Fee Act of 1976 (42 U.S.C.S. § 1988)]; and *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (also involving 42 U.S.C.S. § 1988)). The fee applicant bears the burden of showing that the claimed rate, as enhanced, and the number of hours are reasonable (*Blum v. Stenson*, *supra*, 465 U.S. at 897, 104 S.Ct. at 1548).

■ While recognizing "... that the general principles (underlying enhancements under fee-shifting statutes) may require some accommodation to the peculiarities of bankruptcy matters, particularly where enhancements relate to the risk of nonpayment", the Ninth Circuit has held that despite certain manifest differences, "§ 330 and fee-shifting statutes are sufficiently similar to justify applying those general principles for fee enhancements in bankruptcy cases". (*In re Manoa Finance Co., Inc.*, 853 F.2d 687, 691 (9th Cir.1988)). As in those cases involving fee-shifting statutes, the lodestar (standard billing rate

for all time reasonably expended, plus costs) is "strong[ly] presum[ed]" to constitute "reasonable compensation" for the purposes of 11 U.S.C. § 330, even in the unusual case. (*In re Manoa Finance Co., Inc., supra*, 853 F.2d 687, 692).

The above-referenced presumption is, however, rebuttable (*Blum v. Stenson, supra*, 465 U.S. 886, 897, 104 S.Ct. 1541, 1548) and the court may award an enhancement to a fee applicant who convincingly shows by "specific evidence" 1) that his or her case was one of *"exceptional success"* (*Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983))[4], 2) that a relevant factor (*infra*) was not adequately reflected by the initial lodestar calculation (*see, e.g., Blum v. Stenson, supra*, at 899, 104 S.Ct. at 1549; *In re Manoa Finance Co., Inc., supra*, 853 F.2d at 692) and, 3) that such a bonus is necessary to make the award commensurate with compensation for comparable nonbankruptcy services (*id.*).

■ The courts have traditionally considered the following factors when evaluating a request for a fee enhancement: 1) the time and labor required, 2) the preclusion of other employment by the attorney due to acceptance of the case, 3) the customary fee, 4) whether the fee is fixed or contingent, 5) time limitations imposed by the client or the circumstance, 6) the amount involved, 7) the "undesirability" of the case, 8) the nature and length of the professional relationship with the client, and 9) awards in similar cases. (*Kerr v. Screen Extras Guild*, 526 F.2d 67 (9th Cir.1975), *cert. den.*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976), adopting twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974)).

■ Likewise, although *presumed* to be subsumed within the lodestar, the following four factors can support an upward adjustment where the applicant shows by specific evidence that they have not been

---

**4.** The United States Supreme Court stated in *Hensley v. Eckerhart* that "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably

expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified." (461 U.S. at 435, 103 S.Ct. at 1940).

fully reflected in the lodestar: 1) the novelty and complexity of the issues, 2) special skill and experience of counsel, 3) the quality of representation, and 4) the results obtained. (*In re Manoa Finance Co., Inc., supra,* at 691, citing *Penn I, supra,* 478 U.S. at 564–69, 106 S.Ct. at 3097–3100; *Blum v. Stenson, supra,* at 898–900, 104 S.Ct. at 1548–49). Finally, where the fee applicant establishes that without an adjustment for risk of nonpayment the applicant's client "would have faced substantial difficulties in finding counsel in the local or other relevant market" and, further, that the market rate of compensation for that *class* of work is commensurate with the enhanced compensation sought by the applicant, the court may grant an enhancement based upon the element of risk of nonpayment. (*Hasbrouck v. Texaco, Inc.,* 879 F.2d 632, 636–37 (9th Cir.1989); *Fadhl v. City and County of San Francisco,* 859 F.2d 649, 650 (9th Cir.1988), citing *Pennsylvania v. Delaware Valley Citizen's Council for Clean Air* (hereinafter "Penn II"), 483 U.S. 711, 733, 107 S.Ct. 3078, 3091, 97 L.Ed.2d 585 (1987)).

Finally, as pointed out by the dissent in *Penn II,* the Supreme Court is at least open to the idea of granting an enhancement based upon a showing of a delay in payment of fees. (*Penn II, supra,* 483 U.S. at 736, 107 S.Ct. at 3092). With the above admonitions and guidelines in mind, the court will now attempt to evaluate the reasonable value of the services rendered by the Applicant in this matter.

### 1) *Reasonable Attorney's Fees*
#### a. Initial Lodestar

■■■ The objections to the fee applications were many and voluminous. The alleged fee setting matter (which consumed a lot of paper on both sides) has been resolved in Applicant's favor. With the exception of the objection to Applicant's practice of recording his time in quarter-hour segments rather than in 6 minute segments, which although improper is regard-

ed as *de minimus* in this case, no serious objections have been raised to the *amount* of time reflected in Applicant's billings. After reviewing Applicant's billings and declarations and the objections thereto, the court finds that the 262.2 hours spent on the matters described in those billing statements were both actually and necessarily rendered and constitute the number of hours reasonably expended on this matter. (11 U.S.C. § 330(a)). Further, having determined that the Applicant's regular hourly billing rates of $150.00 per hour for legal services rendered prior to June, 1987, and $175.00 an hour from June 1987 onward are reasonably commensurate (albeit on the high-end) with this region's "going rate" for comparable bankruptcy services, and further that said rates do not or did not exceed the rates charged for comparable nonbankruptcy services [5] during the dates concerned, the court finds that those rates are, at the very least, reasonable. The court also finds that the lower hourly rate used by Applicant in motion no. MJC–500 is also appropriate, since most of the time spent was in preparation of, and defense of, his fee applications. Consequently, the court finds that the proper lodestar amount (which is the first step in determining reasonable compensation in any bankruptcy case) for Applicant as attorney for the Trustee in this matter to be the amounts previously approved and paid plus the amounts requested in motion nos. JLL–1 and MJC–500 as summarized above.

#### b. Propriety of an Enhancement

Applicant bases his request for a $300,-000.00 enhancement upon three factors: 1) results obtained (including monies saved), 2) risk of nonpayment and 3) the equities of the case. Although the first two factors are clearly relevant, the court agrees with the Equity Security Holders Committee that the consideration of the "equities" is, at least in the context of this particular case, inappropriate and irrelevant to the issue of whether the requested compensation is "reasonable".

---

5. For the foregoing proposition, the court relied in part upon its own experience in these matters as well as upon the findings by Judge Christo- pher M. Klein in *In re Gire, Inc.,* 107 B.R. 739, 743 (Bkrtcy.E.D.Cal.1989).

■ As was indicated above, the consensus within the Ninth Circuit is that an applicant may only qualify for an enhancement based upon a risk of nonpayment if he or she shows that absent an adjustment for such a risk the Debtor would have had serious difficulty in securing counsel in the local or other relevant market and that the market rate of compensation for the class of work (bankruptcy) is commensurate with the enhanced compensation sought by the applicant.

Applicant has shown that it was problematical as to whether sufficient funds would be available to pay Applicant all of his fees at the inception of the case. The Debtor really had but one asset; a thirteen floor commercial office building in downtown Sacramento. According to Applicant's uncontroverted declaration filed on 6/14/89 (hereinafter "CoBen Declaration") at page 7, the Debtor only had $83,377 in its bank account which approximately represented the rental security deposits. The holder of the only deed of trust on the Debtor's property, Aetna Life Insurance Company (hereinafter "Aetna"), was owed the principal sum of $21,159,312.52 with accrued interest due of $669,750 and interest accruing at the rate of $223,250 per month. In addition, Aetna was claiming a prepayment penalty of $9,000,000 in the event of a sale, as well as asserting its cash collateral rights in the rental income. Finally, there were the expected emergency matters to attend to (see infra). There was, however, an offer outstanding to purchase the building for $23,000,000 and it was netting approximately $64,000.00 per month after operating expenses. Under these circumstances, Aetna's prospects for a successful motion for relief from stay were good, while the prospects for a trustee's motion to use cash collateral were not.

But Applicant has not shown that the Debtor would have had difficulty in obtaining competent counsel to represent the Trustee without a fee enhancement. He was the first (although not the sole) person approached by the Debtor's general partners to act as trustee and, then, following his appointment, Applicant had himself appointed as counsel to the trustee. It should also be noted that other professionals (including other attorneys) accepted employment as trustee representatives quite early in the case. At best, Applicant has made a showing that because he had to wait until the building was sold in December 1986 before he could get paid for his services, an enhancement for delay might be appropriate.

■ Although Applicant failed to pass the "risk of nonpayment" hurdle, the court is in substantial agreement that the "results achieved" in this case were, indeed, exceptional and rare. In addition to the problems recited supra, at the time the bankruptcy petition was filed, only 45% of the available rental space in the One City Centre building was occupied.[6] To further complicate matters, a judgment had been rendered against the Debtor and in favor of Teachers Insurance & Annuity Association of America (hereinafter TIAA) in an amount exceeding $3 million by the United States District Court, Southern District of New York on January 28, 1986 and was on appeal. (*Teachers Insurance & Annuity Association of America v. Butler, et al.,* 626 F.Supp. 1229 (S.D.N.Y.1986)). In addition, The Federal Savings and Loan Insurance Corporation ("FSLIC") on behalf of Bell Savings and Loan (declared insolvent and taken over by FSLIC) was pressing a $3.25 million claim against the Debtor for monies which were loaned by it to Debtor through one of its general partners, James Kassis, and which remained outstanding.

The foregoing list compiles only the most pressing problems. In addition, the Trustee and his counsel were confronted with over $1 million in unsecured claims (excluding the $3.25 million claim by Bell/FSLIC),

---

6. Leasing efforts were apparently hampered by the availability of comparable space offered in the newly constructed Lincoln Plaza building, an eighteen story office building constructed at approximately the same time and in the same general location as the One City Centre Building. In addition, Aetna's reluctance to allow access to its cash collateral to fund extensive tenant improvements required by prospective tenants further hindered the Applicant's leasing efforts. (CoBen Declaration, *supra,* at p. 9).

over $100,000.00 owing to various taxing authorities, and ever-mounting priority claims by various special counsel appointed to protect or represent the interests of the estate in the various pending lawsuits and negotiations to compromise claims. As was noted above, due to Aetna's security interest in the rents from the One City Centre building, the Applicant also faced the problem of obtaining the necessary funds to finance the substantial tenant improvements demanded by prospective lessees.

Despite the substantial adversities facing him at the commencement of the case, and within a remarkably short period of time (eleven months from filing to sale date), Applicant was able to lease-up the One City Centre building to approximately 84 percent capacity (not including other leases which were still in the negotiating stages at the time of sale), negotiate and compromise the claims of all secured and unsecured creditors, sell the building for $34.5 million cash (without incurring a broker's fee and before January 1, 1987, the effective date that the capital gains tax would rise from 20% to 28%), satisfy the compromised claims of all secured and unsecured claims, and retain enough funds to pay all administrative and priority claims and an as yet unascertainable dividend to the equity security holders.

The court considers this to be a extraordinarily rare and exceptionally successful resolution under the circumstances and credits the Applicant's creativity, spontaneity, business acumen, and diligence as the primary cause. Here, Applicant was confronted with a "tricky" scenario at best. A single misstep in a case of this magnitude could easily have resulted in a substantial loss to every involved interest from the secured creditor to the administrative claimants and equity security holders. Despite the incredible pressure, however, Applicant performed flawlessly and achieved a substantial and unlikely benefit to the estate (ie., full satisfaction of claims).

In light of the referenced circumstances, the court is inclined to agree that the value Applicant's services exceeded the value reflected by the initial lodestar calculation. Further, the court feels that a modest enhancement would serve to encourage local counsel to "go the extra yard" on behalf of unsecured creditors and the estate and to strive for exemplary results. Even when "results" are presumably subsumed in the lodestar, courts still have the authority to reward exemplary results, and should do so in the appropriate case.

### c. Disposition

■■■■ Although highly impressed by the Applicant's performance in this matter, the court is mindful of higher courts' concern over possible windfalls in fee awards. An enhancement for results obtained should not, in this court's opinion, be as large as enhancements for risk of no fees at all, particularly if that risk is significant. In the instant case, Applicant bore a very modest risk of loss, achieved superb results, but had to wait a year before receiving any payment. An enhancement of $35 per hour for the 930 (922.25 + 7.75) hours he put in at the initial stages of the case when his most productive time was spent, plus $10 per hour for the 106.85 hours spent in "wrapping up" the case should serve to reward him for the achieved results and compensate him for any risk of loss and delay in payment[7]. This enhancement amount of $33,618.50 raises Applicant's initial billing rate to his ending billing rate and adds a bonus factor of $10 and hour. Furthermore, the combined rate of $185 an hour does not, in this court's estimation and experience, create a windfall for the Applicant nor is it likely to propel Applicant's compensation in this matter above fees recovered or recoverable in comparable nonbankruptcy services.[8]

---

7. The court declines to enhance the fee request contained in motion no. MJC–500, since the bulk of the time included therein was in preparing Applicant's fee applications.

8. Again, the court relies upon its own experience in these matters and on the court's findings in *In re Gire, supra,* 107 B.R. 739, 743. The court will remark, however, that the definition or parameters of a "windfall" or, for that matter, "comparable non-bankruptcy services" are necessarily broad and will depend as much upon the facts of the particular case as upon the

### 2) *Reasonable Trustee's Compensation*
#### a. Legal Standards

11 U.S.C. § 326(a) sets forth the pertinent restrictions upon the compensation of a Chapter 11 trustee as follows:

> In a case under chapter 7 or 11, the court may allow *reasonable compensation under section 330* of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed fifteen percent on the first $1,000 or less, six percent on any amount in excess of $1,000 but not in excess of $3,000, and three percent on any amount in excess of $3,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims. (Emphasis added).

Thus, § 326(a) sets a ceiling on the compensation a trustee may recover but does not purport to authorize compensation absent a determination pursuant to the provisions of § 330 of the "reasonableness" of the fees requested. (2 *Collier on Bankruptcy* (15th Ed., 1989) at ¶ 326.01). The test for evaluating the reasonableness of a Chapter 11 trustee's fee is, therefore, "the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than a case under this title." [§ 330(a) ]

 Likewise, the rigorous application formalities set forth in Bankruptcy Rule 2016 [9] will apply with equal force to trustees and serve to further aid the court in its evaluation of the trustee's contribution to the estate. (*In re Orthopaedic Technology, Inc.*, 97 B.R. 596, 600 (Bkrtcy. D.Colo.1989)). Where, as here, the trustee is also acting as his own attorney, compliance with Rule 2016 becomes even more critical as 11 U.S.C. § 328(b) [10] requires the court to differentiate between the trustee's services as trustee, and his services as trustee's counsel, and to fix compensation accordingly. (H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 329 (1977); S.Rep. No. 95–989, 95th Cong., 2d. Sess. 39 (1978), reprinted at 1978 U.S.Code Cong. & Admin. News, pp. 5825, 6285).[11]

#### b. Discussion

The Applicant admits that he failed to maintain a record of the time spent as trustee but estimates that he spent between three and four hundred hours administering the estate in his capacity as Trustee. (CoBen Declaration, Filed 8/17/89, at p. 32, ¶ 39). The court has no reason to doubt Applicant's veracity, but such an estimate, even assuming its accuracy, does little to establish a "value" for the services as required by §§ 328(b) and 330(a).

 Applicant did, however, provide the court with a detailed declaration which describes generally what the Applicant accomplished throughout the pendency of

---

applicant's powers of persuasion. In this case a combined rate of $185 an hour is certainly one of the higher bankruptcy rates in the community. The court's reluctance to award this particular applicant a more substantial enhancement should not, however, be construed as an aversion to enhancements above that hourly rate in appropriate circumstances. Rather, a good result (although not as excellent as was ultimately achieved) was expected by the court, and with no other basis for an enhancement having been shown, the more substantial award requested by Applicant could not issue.

9. Rule 2016 requires, inter alia, that "[a]n entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file with the court an application setting forth a *detailed statement* of 1) the services rendered, time expended and expenses incurred, and 2) the amounts requested ..." (Emphasis added).

10. 11 U.S.C. § 328(b) provides as follows:

 (b) If the court has authorized a trustee to serve as an attorney or accountant for the estate under section 327(d) of this title, the court may allow compensation for the trustee's services as such attorney or accountant only to the extent that the trustee performed services as attorney or accountant for the estate and not for performance of any of the trustee's duties that are generally performed by a trustee without the assistance of an attorney or accountant for the estate.

11. The House and Senate Reports further comment that "the purpose of permitting the trustee to serve as his own counsel is to reduce costs. It is not included to provide the trustee with a bonus by permitting him to receive two fees for the same service or to avoid the maxima fixed in section 326." (*Id.*).

this case. Furthermore, the court was provided with relevant portions of Applicant's deposition testimony by the Equity Security Holders Committee, wherein Applicant described the nature of those services which he deemed to be "trustee work" as opposed to "legal work". From these descriptions, it appears that the Applicant's "trustee work" was of somewhat less value than his "legal work". Nonetheless, this court considers the value of comparable non-bankruptcy services rendered by an attorney acting as a trustee to be equivalent to the attorney's *normal* hourly rate in the ordinary circumstance. Thus, it is the determination of this court that Applicant's reasonable compensation rate for his services as a trustee is $165 an hour.[12]

The fee applications in these motions were hotly contested. The court was deluged with volumes of declarations, exhibits, and authorities in support of and in opposition to them. Having spent countless hours reviewing the record, the court is reluctant to subject itself to a renewed attack. Also, requiring Applicant to attempt to reconstruct time records for his trustee services would add little to the determination process. A summary description of the services performed is perhaps as equally helpful to a court as billing statements when ruling on fee applications.

▆▆▆ Nevertheless, Applicant failed to meet the "detailed statement of ... time expended" requirement of Bankruptcy Rule 2016. Where a trustee fails to keep concise records of time, he necessarily bears the risk that his services may be undercompensated. A proper assumption in such circumstances is that he actually worked the lowest number of estimated hours. *Southwestern Media, Inc. v. Rau*, 708 F.2d 419, 426 (9th Cir.1983). Consequently, this court finds that Applicant spent 300 hours working as the Chapter 11

Trustee. His reasonable compensation is therefore $165 × 300 or $49,500.00.

### c. Conclusion and Disposition

▆▆▆ This court perceives a basic unfairness inherent in an adversarial process that subjects only one of the litigants' counsel to the risk of having their fees curtailed, particularly when that counsel is the one representing the "underdog". On the other hand, one must recognize that court control of fees was the *quid pro quo* for the Congressional policy of assuring adequate compensation in certain areas of the law which had previously gone begging for good counsel. One way to reduce the perception of unfairness in the fee setting process is to curtail the risk of unfulfilled expectations on the part of attorneys. Having to wait for payment is bad enough; working diligently on a case of long duration with no guarantee of payment but the expectation of an enhanced fee upon the successful conclusion thereof is disastrous when that expectation is denied[13]. In the bankruptcy arena, expectant attorneys have the means of reducing the risk of aborted expectations. A noticed employment application under Bankruptcy Rule 2014 can serve to alert the court and all interested parties of the anticipated enhancement, and an interim fee application pursuant to 11 U.S.C. § 331 brought early in the case (even before funds are available[14]) could test the reasonableness of any expectations before they have ripened into a perceived entitlement. An attorney who waits until the end of a case, as Applicant did here, runs the risk that neither the court nor the ultimate beneficiaries of his efforts share his opinion as to the reasonableness of the compensation he seeks.

The foregoing constitutes this court's findings of fact and conclusions of law

---

**12.** The court has created a blended rate based upon Applicant's beginning and ending hourly rates, and the results achieved, effects of delay and risk of non-payment, as discussed above in respect to his request for attorney's fees, and consideration of local practice when attorneys act as receivers or trustees in state court proceedings.

**13.** *See, e.g., In re Fall,* 93 B.R. 1003 (Bankr.D.Or. 1988).

**14.** There does not appear to be any prohibition under § 331 for a court to *approve* fees before funds are available for payment, so long as *authorization·* for payment is deferred by the court until funds are available.

where appropriate. An order consistent with the above findings will be issued by the court forthwith.