In re POWERINE OIL COMPANY, a California corporation, Debtor.

FIRST NATIONAL BANK OF CHICAGO; First Interstate Bank of California; Crocker National Bank; Security Pacific National Bank; Interfirst Bank of Dallas; Banque Paribas; and Republic Bank Dallas, Appellants,

v.

COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS, Appellees.

BAP No. CC–85–1581–VMoMe.

Bankruptcy No. LA 84–07086–RM.

United States Bankruptcy Appellate Panels of the Ninth Circuit.

Argued and Submitted April 16, 1986.

Resubmitted * Oct. 15, 1986.

Decided Dec. 12, 1986.

* This appeal was resubmitted when U.S. Bankruptcy Judge Robert G. Mooreman replaced U.S. Bankruptcy Judge Seymour J. Abrahams on the panel.

Richard W. Havel, Sidley & Austin, Los Angeles, Cal., for appellants.

Richard K. Diamond, Danning, Gill, Gould, Joseph & Diamond, Los Angeles, Cal., for appellees.

Before VOLINN, MOOREMAN and MEYERS, Bankruptcy Judges.

## OPINION

VOLINN, Bankruptcy Judge:

This appeal is concerned with the fixing of attorney fees, a most sensitive and difficult area of effort frequently involving bankruptcy judges.[1]

The "Bank Group," secured creditors, appeals from the bankruptcy court's order awarding fees of $64,298.25 pursuant to 11 U.S.C. § 330 to the attorneys for the Committee of Creditors Holding Unsecured Claims (Creditors' Committee). The Bank Group contends that the law firm's hourly rates were excessive, and that the bankruptcy court abused its discretion by awarding the law firm an amount that was 50 percent over its normal hourly rates. We hold that the bankruptcy court did not abuse its discretion and affirm.

## I.

The debtor, Powerine Oil Company, filed a Chapter 11 petition on March 26, 1984. The debtor had been in the business of operating a crude oil refinery, pipelines, terminals, and an oil production operation.

When the case was filed, all of the assets of the estate were subject to the secured claims of the Bank Group and another group referred to as the "Insurance Companies." The secured debt owing to these two groups totaled $285 million. The total value of the collateral at that time was said to be "only a fraction" of the amount of secured debt.

On commencement of the case, the U.S. Trustee designated a Creditors' Committee. It was unable to find counsel willing to represent it for approximately 90 days. One law firm resigned after the bankruptcy court denied a motion for payment pursuant to 11 U.S.C. § 506(c). The bankruptcy court denied this motion because it was not possible to determine whether services of counsel would benefit holders of collateral. There is little doubt that law firms declined representation because compensation would be contingent on availability of funds derived from secured creditors or voidable transfers. At the outset of the case, such availability was not readily apparent.

Almost three months after bankruptcy was filed, on application of the Creditors' Committee to employ Danning, Gill, Gould, Joseph & Diamond (Danning, Gill) as counsel, an order of appointment was entered on June 11, 1984. Danning, Gill thereafter

---

1. A perceptive comment appears in *Planned Parenthood v. State of Arizona*, 789 F.2d 1348, 1351–52 (9th Cir.1986) (re 42 U.S.C. § 1988):

    At the outset we note that determination of attorneys' fees 'is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion.' *Rutherford v. Pitchess*, 713 F.2d 1416, 1420 (9th Cir.1983); *see Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) (emphasizing 'the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters'). We also acknowledge that looking over the shoulders of attorneys to examine their charges is not a task welcomed by judges. Fee shifting makes our scrutiny necessary, however. Even though our competence to undertake this scrutiny is limited at best, we must assume the burden because at present no other bearer is available. Somebody must decide what fees should appropriately be shifted to the loser. No doubt our 'incompetence' in this area is no greater than it is in many others in which we are compelled to render decisions; and it is, I suspect, our limited ability to avoid decisionmaking, in comparison to that enjoyed by the other two great branches of government, that induces many litigants to crowd our portals.

    So, in full awareness of our limitations, we address the issue of attorneys' fees.

represented the Creditors' Committee throughout the rest of the case.

Approximately one year later, on June 13, 1985, Danning, Gill filed the present application for compensation. The application showed that seven attorneys had worked a total of 199.8 hours, which, at their normal hourly billing rates, amounted to a fee of $42,865.50. David Gould, a senior partner, was accountable for 166.2 hours, or 83 percent of the total time. His charge was $225 to $250 per hour.

The application stated, among other things, that Danning, Gill had reviewed the conduct of the debtor and secured creditors and had arrived at certain conclusions; i.e., that the Bank Group and Insurance Companies did not want to be put to the possible expense and risk of litigating an issue of equitable subordination, and that they were reluctant, in the event of foreclosure, to acquire assets of a potentially problematical nature. According to the application, Danning, Gill's "greatest contribution to the case came in convincing the Bank Group and the Insurance Companies of the necessity to resolve this matter by way of a plan of reorganization." The application continued:

> At the time Applicant was retained, there were no unrestricted funds available to pay Applicant's fees and there was little, if any, prospect of general unsecured creditors receiving any distribution whatsoever. Solely as a result of Applicant's efforts, general unsecured creditors will receive pro rata distribution from a cash fund of not less than $2,000,000, the accrued interest thereon, plus 50% of the net preference recoveries up to $5,000,000 and 25% in excess of $5,000,000.

The provision for the cash fund of not less than $2 million resulted from the agreement of the banks to pay Chapter 11 expenses of administration, including fees of appellee. Danning, Gill requested a fee award of $200,000, or 10 percent of the $2 million fund, or close to five times its hourly rate. The secured lenders objected to this request and a hearing was held before the bankruptcy court on July 1, 1985. The court took the matter under advisement and later entered the order from which this appeal is taken. Among the bankruptcy court's findings and conclusions were the following:

> —At the time when Danning, Gill was retained, "It was entirely possible that Applicant would put in hundreds of hours of service in connection with the case and expend many thousands of dollars of out-of-pocket disbursements and receive no payment whatsoever therefor."

> —As a result of the negotiations concerning the terms of the plan of reorganization in which Danning, Gill participated, the plan, which was filed by the Debtor with the support of the Bank Group and Insurance Companies and the Committee, provided for the payment of all administrative and priority claims and the sum of $2 million in cash for the benefit of general unsecured creditors.

> —The "practical effect" of the confirmed plan was that "the secured lenders made available approximately $9.1 million for the benefit of parties other than themselves being approximately $7.1 million for administrative and priority claims and $2 million for general unsecured creditors."

> —In addition, the plan provided for the $2 million to be paid to general unsecured creditors to be net. As such, the fees to be paid to Danning, Gill were in addition to the $2 million. This element was a negotiated term in the plan of reorganization which benefited unsecured creditors.

> —Danning, Gill had received no interim compensation. Its entitlement to compensation was to a large extent contingent upon the results obtained, which were "exemplary, the Committee's counsel having achieved precisely the goals for which it was retained."

The factors considered by the bankruptcy court in making the award were summarized as follows:

> Taking into account all relevant factors normally considered in determining fees, including results obtained, hours required to obtain the results, difficulty

and novelty of the issues, expertise required, amounts in controversy, contingencies as to payment, time limitation imposed by the circumstances of the proceedings, the impact of the employment as precluding other employment, and reasonable fees charged by other firms in the Los Angeles area with similar standing and experience, a fair, just, and reasonable compensation for the services rendered by Applicant described in the application is the sum of $64,298.25.

## II.

The Bank Group does not object to the number of hours expended by Danning, Gill, nor to the quality of services rendered. In fact, the Bank Group refers to Danning, Gill as "an outstanding bankruptcy firm."

Instead, the Bank Group makes two arguments. First, it computes Danning, Gill's "blended" hourly rate to be $215 per hour ($42,865.50 divided by 199.8 hours), and contends that such a rate is excessive in light of the nature of legal services performed and the "undue reliance" placed on more expensive senior counsel. Second, the Bank Group contends that the bankruptcy court abused its discretion, under the facts and circumstances of this case, by awarding the equivalent of a 50 percent "bonus" on top of its regular hourly rates, because Danning, Gill did not obtain exceptional results and because any risk of nonpayment did not justify enhancing their compensation.

Danning, Gill contends that the high risk of nonpayment in this case was a factor properly considered by the bankruptcy court which, in conjunction with the extraordinary results obtained, amply justified the fees awarded.

## III.

A bankruptcy court's award of attorneys' fees will not be disturbed on appeal absent an abuse of discretion or an erroneous application of the law. *In re Nucorp*

*Energy, Inc.*, 764 F.2d 655, 657 (9th Cir. 1985).

The fees in this case were awarded pursuant to 11 U.S.C. § 330(a)(1), which provides that the bankruptcy court may award "reasonable compensation for actual, necessary services rendered" by an attorney "based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title."

Prior to the enactment of the present Bankruptcy Code, the Ninth Circuit followed the judicially fashioned "strict rule of economy". *See In re THC Financial Corp.*, 659 F.2d 951, 955 n. 2 (9th Cir.1981), *cert. denied*, 456 U.S. 977, 102 S.Ct. 2244, 72 L.Ed.2d 852.[2] The purpose of Code Section 330 was to overrule this doctrine, and to ensure adequate compensation for bankruptcy attorneys so that qualified specialists would not be forced to abandon the practice of bankruptcy law in favor of more remunerative kinds of work. *In re Nucorp Energy, Inc., supra*, at 658, *citing* H.R. Rep. No. 595, 95th Cong. 1st Sess. 330, reprinted in 1978 U.S. Code Cong. & Ad. News 5787, 5963, 6286. Accordingly, pursuant to the statutory directive contained in Section 330, this Court will depart from the "strict rule of economy" approach as set forth in *Southwestern Media, Inc. v. Rau*, 708 F.2d 419 (9th Cir.1983), and *THC, supra*, in favor of the application of factors similar to those considered in non-bankruptcy settings.

A key Ninth Circuit case discussing the test for calculating a reasonable attorney's fee under Code Section 330 is *In re Yermakov*, 718 F.2d 1465 (9th Cir.1983), which states: "The primary method used to determine a reasonable attorney fee in a bankruptcy case is to multiply the number of hours expended by an hourly rate." *Id.* at 1471. Elsewhere, this has been referred to

---

2. Bonuses were not allowed to attorneys in successful cases under the Bankruptcy Act because of this rule. *See Southwestern Media, Inc. v. Rau,* 708 F.2d 419, 428 (9th Cir.1983); *In re THC*

*Financial Corp.,* 659 F.2d 951, 955 (9th Cir. 1981), *cert. denied* 456 U.S. 977, 102 S.Ct. 2244, 72 L.Ed.2d 852.

as the "lodestar" [3] or basic fee, which, if warranted, can be adjusted upward or downward.[4]  At the end of its discussion of the law, the court added: *"see Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974) (listing numerous factors to be considered in awarding attorneys' fees)." *Id.*

*Johnson* was concerned with Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k).  The Fifth Circuit in that case set forth 12 factors which have since become quite well known and widely cited: (1) The time and labor required, (2) The novelty and difficulty of the questions, (3) The skill requisite to perform the legal service properly, (4) The preclusion of other employment by the attorney due to acceptance of the case, (5) The customary fee, (6) Whether the fee is fixed or contingent, (7) Time limitations imposed by the client or the circumstances, (8) The amount involved and the results obtained, (9) The experience, reputation, and the ability of the attorneys, (10) The undesirability of the case, (11) The nature and length of the professional relationship with the client, and (12) Awards in similar cases. *Johnson,* 488 F.2d at 717–19.[5]  *Accord Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir.1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976).

The Ninth Circuit's approach in *Yermakov* is consistent with that later expressed by the United States Supreme Court in other contexts providing for statutory attorney's fees.  That Court has contexts providing for statutory attorney held that the "initial estimate" of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended times a reasonable hourly rate.  *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1543, 79 L.Ed.2d 891, 895 (1984); *Hensley v. Eckerhart,* 461 U.S. 424, 432–34, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40, 50 (1983).  Thereafter, adjustments to that fee may be made as appropriate in the particular case.  *Blum,* 465 U.S. at 888–90, 104 S.Ct. at 1544, 79 L.Ed.2d at 896; *Hensley,* 461 U.S. at 434–35, 103 S.Ct. at 1940, 76 L.Ed.2d at 51.  In a footnote, the *Hensley* court added that although a lower court may also consider the factors identified in the *Johnson* case, "it should note that many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Hensley,* 461 U.S. at 434 n. 9, 103 S.Ct. 1933, 1940 n. 9, 76 L.Ed.2d at 51 n. 9.[6]

The most recent pronouncement by the United States Supreme Court indicates that the lodestar fee should be enhanced only in rare and exceptional cases:

---

**3.** The calculation of attorney's fees in bankruptcy matters is now analogous to that performed in other areas of the law.  Accordingly, this Court will utilize the terminology and reasoning of those non-bankruptcy determinations to provide consistency in the application of the various factors and the results achieved. *See e.g., In re Jensen-Farley Pictures, Inc.,* 47 B.R. 557 (Bankr.D.Utah 1985); *Matter of Kero-Sun, Inc.,* 59 B.R. 630, 633–34 (Bankr.D.Conn.1986).

**4.** The lodestar approach has also been adopted in Ninth Circuit cases concerned with the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d): *see Underwood v. Pierce,* 761 F.2d 1342 (9th Cir.1985); *LaDuke v. Nelson,* 762 F.2d 1318 (9th Cir.1985), modified 796 F.2d 309 (9th Cir.1986); and *Int'l Woodworkers of America v. Donovan,* 792 F.2d 762 (9th Cir.1986); and in cases concerned with the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. § 1988: *see Planned Parenthood v. State of Arizona,* 789 F.2d 1348 (9th Cir.1986); *Chalmers v. City of Los Angeles,* 796 F.2d 1205 (9th Cir.1986); and *Clark*

*v. City of Los Angeles,* 803 F.2d 987 (9th Cir. 1986).

**5.** Although the 12 *Johnson* factors have been criticized, they have not been fully abandoned. Rather, the difficulties courts experienced in actually working with an array of standards such as those encompassed by the 12 *Johnson* factors led to the development of the "lodestar" approach. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. ——, ——, 106 S.Ct. 3088, 3097, 92 L.Ed.2d 439, 455 (1986); *Copeland v. Marshall,* 641 F.2d 880, 889–91 (D.C.Cir.1980) (en banc) (Title VII case).

**6.** The *Hensley* approach was later characterized by the United States Supreme Court as a "hybrid approach that shared elements of both *Johnson* and the lodestar method of calculation." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. ——, ——, 106 S.Ct. 3088, 3097, 92 L.Ed.2d 439, 455 (1986).  *See also Jordan v. Multnomah County,* 799 F.2d 1262, 1265 (9th Cir.1986).

Although upward adjustments of the lodestar figure are still permissible, ... such modifications are proper only in certain 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record and detailed findings by the lower courts ...

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. ——, ——, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439, 456 (1986) (re the Clean Air Act, 42 U.S.C. § 7401 *et seq.*). *Accord, Clark v. City of Los Angeles*, 803 F.2d 987 (9th Cir.1986).

## IV.

### A.

■ The Bank Group first challenges the calculation of the lodestar fee itself, contending that Danning, Gill's "blended" hourly rate of $215 is excessive. It argues that Danning, Gill has greatly exaggerated its role in the confirmation process and that the plan was substantially drafted by the time that Danning, Gill was employed. The Bank Group also argues that undue reliance was placed on more expensive senior counsel and that most of the services performed were of a routine nature.

The 14–page application for compensation was supported by biographies of the relevant attorneys and a 30–page summary of the professional services rendered. David Gould, the attorney who performed 166.2 hours or 83 percent of the work, is a lawyer with 20 years' experience. His billing rate was $225 per hour in 1984 and $250 per hour in 1985. There is no evidence that these fees represent other than Gould's normal hourly rates. Because the Bank Group does not object to the number of hours, its argument boils down to the assertion that Gould unwarrantedly performed most of the work. Many areas of legal analysis and negotiations described in the application for compensation are such as would reasonably require effort of a senior-level partner. An appellate court is in no position to second-guess the factors that may have caused a senior lawyer rather than a junior lawyer to perform the work required on a case. Absent sufficient evidence compelling a contrary conclusion, we hold that Danning, Gill's hourly rates were not excessive.

### B.

The Bank Group's second argument on appeal requires us to examine whether the lodestar fee under Code Section 330 can ever be adjusted upwards due to the factors of the results obtained or the risk of nonpayment, and, if so, whether the 50 percent upward adjustment in this case was an abuse of discretion.[7]

■ The burden of proving that an adjustment is necessary to the determination of a reasonable attorney's fee is on the fee applicant. *Blum v. Stenson*, 465 U.S. at 896–98, 104 S.Ct. at 1548, 79 L.Ed.2d at 901. There is a strong presumption that the lodestar figure represents a reasonable fee. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. at ——, 106 S.Ct. at 3098, 92 L.Ed.2d at 456.

#### 1. *Results Obtained*

The "results obtained" is the 8th *Johnson* factor. *See* 488 F.2d at 718. Since *Johnson*, some courts have referred to "exceptional" results, probably due to the Supreme Court's statement that "in some cases of exceptional success an enhanced award may be justified." *Hensley v. Eckerhart*, 461 U.S. at 435, 103 S.Ct. at 1940, 76 L.Ed.2d at 52. *See, e.g., In re Elmendorf Board Corp.*, 57 B.R. 580, 587 (Bankr. D.N.H.1986). The Supreme Court has recognized, however, that because acknowledgment of the "results obtained" generally will be subsumed within other factors used to calculate a reasonable fee, "it normally should not provide an independent basis for increasing the fee award." *Blum v. Stenson*, 465 U.S. at 900, 104 S.Ct. at

---

7. The bankruptcy court did not expressly multiply the normal fee by a factor of 50 percent. Rather, it simply found that the firm's normal fee would have been $42,865.50 and then awarded the sum of $64,298.25. The effect of the award was to allow a 50 percent ($21,432.75) upward adjustment of such normal fee.

1550, 79 L.Ed.2d at 903. *Accord, Jordan v. Multnomah County*, 799 F.2d 1262, 1266 n. 6 (9th Cir.1986). A fee award will be increased for this reason only when the fee applicant presents specific evidence as to what made the results it obtained so outstanding or exceptional, and the lower court makes detailed findings as to why the lodestar amount is not fully compensatory. *Cf. Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. at —— – ——, 106 S.Ct. at 3098–3100, 92 L.Ed.2d at 457–58 (discussing the factors of quality of representation and outstanding results together).

The Bank Group contends that Danning, Gill did not obtain "exceptional results" for the unsecured creditors but rather did what any competent counsel would have done under similar circumstances; i.e., it sought to negotiate a more favorable percentage return than that which was offered by the secured lenders.

The bankruptcy court found that the results obtained for Danning, Gill's client were "exemplary" and resulted in "substantial benefit" to the general unsecured creditors. The bankruptcy court also found, however, that the class of claims subject to ultimate allowance is between $25 million and $100 million. The agreement to provide a $2 million fund therefore results in a percentage return of approximately 2 to 10 percent. While this is better than nothing, it is not exceptional, and is not comparable to *In re Elmendorf Board Corp.*, 57 B.R. 580 (Bankr.D.N.H.1986), cited by appellee, where counsel brought about *full* payment to the unsecured creditors.

■ We conclude that the factor of "results obtained" was, by itself, insufficient in this particular case to justify an upward adjustment of the lodestar fee, under the most recent authority of the United States Supreme Court, cited above.

2. *Contingencies as to Payment*

■ The United States Supreme Court has expressly left open the question of whether an upward adjustment of the lodestar may be based on the risk of loss. *See*

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. at ——, 106 S.Ct. at 3099–3100, 92 L.Ed.2d at 458. However, Justices Brennan and Marshall have previously stated their views that, at least as to 42 U.S.C. § 1988, "Congress has clearly indicated that the risk of not prevailing, and therefore the risk of not recovering any attorney's fees, is a proper basis on which a district court may award an upward adjustment to an otherwise compensatory fee." *Blum v. Stenson*, 465 U.S. at 902, 104 S.Ct. at 1550, 79 L.Ed.2d at 904 (Brennan, J., concurring), citing *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (Brennan, J., concurring in part and dissenting in part).

At this point, we note appellants' contention that the Bankruptcy Code, 11 U.S.C. § 328, and B.R. 2014 specifically provide for a retainer on a contingent fee basis. This statutory contingency fee authorization is absent from virtually all the cited cases and statutes providing for fees in settings other than bankruptcy. It is therefore arguable that the contingent aspect of lodestar should not be considered in the bankruptcy setting unless specifically authorized by Section 328 and Rule 2014. We further note that one of the provisions of the debtor's plan allows a contingency fee in the event that appellees prosecute and effect recoveries in substantial preference suits.

However, common experience with the bankruptcy process demonstrates that it is generally attended by uncertainty and contingency. It therefore would be inappropriate to hold that the provisions of the foregoing section and rule as to employment on a contingent fee basis call for exclusion of consideration of the contingency factor where counsel is employed on a noncontingent retainer basis. As the court in *Chalmers v. City of Los Angeles, supra,* stated:

> Despite the confusion in the case law, it should be noted that contingent adjustments are not the same as a contingency fee arrangement. Contingency fee arrangements, like the one at issue in this case, are arrangements where an attor-

ney's fee is based on a percentage of the amount recovered by his client. Contingency adjustments, which were not present in the case at bar, are a percentage increase over and above the amount obtained by multiplying hours expended by hourly rate; arrangements which call for contingency adjustments are specifically designed to reflect the risk that no fee may be obtained. *Blum*, 465 U.S. at 903 n *, 104 S.Ct. at 1551 n *. (Brennan, J., concurring).

796 F.2d at 1212–13 n. 4.

The *Chalmers* opinion agreed with Justice Brennan that: "The risks of not prevailing or not recovering any fees appear to be bases or exceptional circumstances which may justify an upward adjustment in rare cases." *Chalmers v. City of Los Angeles, supra,* at 1212.

More recently, the Ninth Circuit has upheld the increase of the lodestar fee amount by a multiplier of 1.5 due to the contingent nature of the fee arrangement, recognizing the risk and delay in payment inherent in such fee arrangements, where the record showed that an adjustment was necessary to award counsel the "reasonable" fee to which he was entitled. *See Clark v. City of Los Angeles, supra* (42 U.S.C. § 1988). The court concluded that it was one of those "rare" and "exceptional" cases in which an upward adjustment was justified.

We believe that this, too, is such a rare case. The Creditors' Committee was unable to find counsel willing to represent it for approximately 90 days, and at least one firm resigned its representation after the bankruptcy court denied its motion for payment of services pursuant to Code Section 506(c). The bankruptcy court specifically found that at the time of Danning, Gill's retention:

> ... it was entirely possible that Applicant would put in hundreds of hours of service in connection with the case and expend many thousands of dollars in out-of-pocket disbursements and receive no payment whatsoever therefor.

As to this factor, there is sufficient evidence and detailed findings of the type

required by *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, supra.* Despite the high risk of nonpayment, Danning, Gill, pursuant to the order of appointment, proceeded with its representation of creditors. We hold that the bankruptcy court did not abuse its discretion by enhancing the fee award to take this factor into account, and that the amount of fees awarded was reasonable.

V.

The order for allowance of compensation and reimbursement of expenses for the Creditors' Committee's attorneys is AFFIRMED.