**In re Alice Z. GIRE aka Fiesta Manor Motel, Debtor.**

**In re B.E.S. CONCRETE PRODUCTS, INC., a Nevada Corporation, Debtor.**

**Bankruptcy Nos. 288–00269–C–11, 287–05895–C–11.**

United States Bankruptcy Court, E.D. California.

Sept. 29, 1989.

4. I leave it to Marathon to decide whether to make an appropriate motion.

Cindy Lee Hill, Law Offices of Melvyn J. CoBen, Sacramento, Cal., for Unsecured Creditors Committee.

Judith Hotze, Office of U.S. Trustee, Sacramento, Cal., for U.S. Trustee.

Edward M. Wolkowitz, Robinson, Diamont, Brill & Klausner, Century City, Cal., for trustee Marathon Home Loans.

### MEMORANDUM ON FEE APPLICATIONS BY LAW OFFICES OF MELVYN J. COBEN

CHRISTOPHER M. KLEIN,
Bankruptcy Judge.

These are two fee applications that are ordered consolidated at the request of the applicant for purposes of decision. One is made in the applicant's capacity as counsel for the debtor in possession and the other as counsel to the committee of unsecured creditors. Common questions of law and fact justify consolidated treatment.

The first application is entitled Motion For Order Approving And Authorizing Payment Of Interim Compensation Of Attorneys' Fees and is filed in counsel's capacity as counsel for a chapter 11 debtor in possession in *In re Alice Z. Gire*, No. 288–00269–C–11. The case was filed January 15, 1988. The Law Offices of Melvyn J.

CoBen ("counsel") was authorized to be employed as counsel by order dated January 19, 1988, which order deferred the determination of all issues relating to compensation until presented in a fee application. Counsel has applied for total compensation of $31,604.79 through July 24, 1989.[1] On September 28, 1989, counsel stipulated in open court to convert the case to chapter 7.

The second application is entitled Hearing On [sic] Application Of Cindy Lee Hill For Order Authorizing Payment Of Interim Compensation Of Attorneys' Fees And For Order Of Appointment Nunc Pro Tunc and is filed in counsel's capacity as counsel to the committee of unsecured creditors in *In re B.E.S. Concrete Products, Inc.*, No. 287–05895–C–11. The order authorizing employment specified an hourly rate for Mr. CoBen and deferred determination of other rates and issues until presented in a fee application.

The United States Trustee has objected to each application.

1. *Officewide Rate.*

The United States Trustee objects in both fee applications to counsel's practice of an officewide billing rate of $175 per hour for every lawyer in the firm. The position of the United States Trustee is that $175 per hour is a premium rate that does not comport with the statutory standard at 11 U.S.C. § 330 for compensation for the services of the junior attorneys employed in the office. As indicated in the next section, $175 per hour is in fact a premium rate in this community.

The United States Trustee relies upon the decision of *In re McKenna*, 93 B.R. 238 (Bankr.E.D.Cal.1988), in which this court held that:

[A] blanket or "blended" rate for everyone in a firm is inappropriate where the rate requested does not fairly reflect the

---

1. Counsel also requests as part of this motion that $25,000 of the fees be applied against secured proceeds of the sale of debtor's hotel property pursuant to 11 U.S.C. § 506(c). The determination of that issue, which would have the effect of making the secured creditor in question pay debtor's attorney fees, has been addressed in a separate memorandum, containing its own findings of fact and conclusions of law. The accompanying order will resolve the fee award and the section 506(c) claim.

range of rates appropriate to the individuals involved. Here, two-thirds of the work was done by an attorney whose lodestar rate has been determined to be $85.00 per hour. [citation omitted] The trustee, however, attempts to bill all services, under the guise of a blended rate, at the premium rate claimed by the most senior attorney in the firm. That is unconscionable.

*See In re McKenna,* 93 B.R. at 240 & n. 1. By billing for all services at a premium rate attributable to the most senior lawyer in a firm, services by very junior lawyers wind up being compensated as if they were services by the most senior lawyer in the firm.

Counsel's argument in favor of the officewide billing rate is as follows (and is quoted in its entirety):

> Since I train and supervise all of the attorneys in my office and am legally responsible for their professional competence it has been my policy that the hourly rate for their work should be the same as the hourly rate which I charge for my work since the quality, due to my training and supervision, is the same. Further, since whether I make a professional mistake or one of my attorneys makes a professional mistake does not effect [sic] my personal legal liability for their work, there is no rationale [sic]

criterion for a different hourly rate to be charged for their work.

Declaration of Melvyn J. CoBen, *In re Wieck,* No. 287–04567–C–11 (March 14, 1989); *id. In re B.E.S. Concrete Products, Inc.,* No. 287–05895–C–11 (Feb. 23, 1989).[2] That argument proves too much as it would allow any law firm to bill senior partner rates for first-year associate work. Moreover, it lacks authoritative support.[3]

During the period covered by these fee applications, counsel has employed, in addition to Mr. CoBen himself, three attorneys. Mr. Franchi is a lawyer of some experience. Ms. Hill is a more junior lawyer who has been in practice for less than four years. Mr. Khoo (a former associate) was a first-year lawyer during the period that he worked for counsel.

An example illustrates the problem with using the premium officewide rate in this particular instance. Mr. Khoo, during the relevant period, had been admitted to practice less than one year. His appearances in this court reflected that, as with many newcomers to the bar, he lacked detailed knowledge of applicable law and procedure. The evidence proffered in support of the application establishes that the rate of $75 per hour is the market rate.[4] Nevertheless, $175 is requested for Mr. Khoo's time.

---

**2.** To the extent that there may be any question about whether the declaration is before the court with respect to *In re Gire,* the court takes judicial notice of it. It is noted that counsel has filed a written request for judicial notice of other declarations in support of the motions for fees in *In re Wieck* and *In re B.E.S. Concrete Products, Inc.*

**3.** *In re Powerine Oil Co.,* 71 B.R. 767 (Bankr. 9th Cir.1986), which is cited to support Mr. CoBen's position, does not support the argument. In that case, a senior partner in a Los Angeles law firm who billed $225 per hour for his services personally did most of the work. When the total amount of hours charged for the attorneys who performed the work, *at their individual hourly rates,* were added up and divided by the total number of hours, it yielded a "blended rate" of $215 per hour. That "blended rate" was merely the weighted average hourly rate under the particular facts and circumstances of that case; if a junior associate had performed 90 percent of the work, the "blended rate" would have been only slightly higher than that individ-

ual attorney's separate billing rate. The Bankruptcy Appellate Panel saw the issue as boiling down to the assertion that the senior partner unwarrantedly performed most of the work, an argument that it rejected because it appeared that the work that actually was done reasonably required the effort of a senior level partner. *In re Powerine Oil Co.,* 71 B.R. at 772.

The objection here is not that Mr. CoBen is unwarrantedly performing services that should be assigned to a more junior lawyer with a lower billing rate. Instead, it is that he is charging his $175 per hour senior partner billing rate for services of a junior lawyer whose individual market rate in the community is much lower.

**4.** As requested by counsel, the court takes judicial notice of the declaration of W. Austin Cooper, another prominent bankruptcy lawyer practicing in Sacramento. Although that affidavit has limited probative value as to rates for comparable *nonbankruptcy* services, it does reveal that Mr. Cooper bills his first-year associate, Mr. Germain, at a rate of $75 per hour. Declaration In Support Of Reply And Support

The court holds that *In re McKenna* controls. The governing standard, as stated in the Bankruptcy Code, requires that compensation be "reasonable compensation for actual, necessary services ... based on the nature, the extent and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title [11]." 11 U.S.C. § 330. Compensation for the services of an attorney materially in excess of the hourly rate that is normally charged in the community for comparable nonbankruptcy services is not reasonable, nor does it take into account the value of the services.

### 2. *Individual Rates.*

Having determined that the requested officewide rate does not comply with the applicable statutory standard, and the orders authorizing employment having (with one exception) [5] left the question of hourly rates open, the appropriate rates for the individuals involved need to be addressed. That requires evidence of market rates for comparable nonbankruptcy services.

#### A. Background.

The method of determining the appropriate rates prevailing in the community is gradually becoming settled.

These fee applications are presented in the wake of this court's decision in *In re Gianulias*, 98 B.R. 27 (Bankr.E.D.Cal. 1989), in which the Ninth Circuit's established body of law regarding the determination of prevailing market rates and regarding the evidence that is needed to determine reasonable hourly rates was drawn upon and applied to compensation for attorneys pursuant to 11 U.S.C. §§ 330 and 331. One important premise of that decision was that section 330 requires the court to take into account the cost of comparable services other than in a bankruptcy case.

In *In re Gianulias* it was pointed out that the Ninth Circuit has reiterated that a fee applicant must provide evidence of prevailing rates in the community:

> The prevailing market rate in the community is indicative of a reasonable hourly rate. The fee applicant has the burden of producing satisfactory evidence, *in addition to the affidavits of its counsel*, that the requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation.

*Southerland v. Int'l Longshoremen's Union, Local 8*, 834 F.2d 790, 795 (9th Cir. 1987) (emphasis in original); *Jordan v. Multnomah County*, 815 F.2d 1258, 1262 (9th Cir.1987). Such evidence is probative of "the cost of comparable services other than in a [bankruptcy] case" that a bankruptcy court must take into account in determining a reasonable fee.

After pointing out that the Ninth Circuit requires that the fee applicant produce satisfactory evidence, in addition to affidavits of the counsel involved, that the rates are in line with those prevailing in the community, it was noted in *Gianulias* that:

> Thus, in addition to affidavits stating the experience of each professional who rendered the services and the rates claimed, there must be evidence in the record that the rates are comparable with prevailing rates in the community. And there must be evidence in the record of the cost in the community of comparable services other than in a bankruptcy case, as required by section 330. Although there is no question that bankruptcy fees are to be awarded at market-based rates, the burden is on the fee applicant to demonstrate the appropriate rate.
>
> Evidence of prevailing legal rates in the community and of the cost of comparable services in nonbankruptcy cases should be from sources other than the opinion of the applicant. *See, e.g., Southerland*, 834 F.2d at 795; *Jordan*, 815 F.2d at

---

Of Motion For Attorney's Fee By W. Austin Cooper, Esq., *In re Wieck* (Apr. 19, 1989).

It also is argued that Mr. Khoo is entitled to a higher rate because he "spent two summers as a law clerk while attending law school" and had some experience as an engineer before attending law school. That is not sufficient to justify a higher rate.

**5.** *See* note 19 *infra.*

1263 n. 9. The applicant should, in addition, provide evidence of what the applicant receives for any nonbankruptcy services.

*In re Gianulias*, 98 B.R. at 29.

Counsel in the Eastern District of California also have the benefit of Judge Milton Schwartz's opinion on a variety of pertinent issues in *Pacific West Cable Co. v. City of Sacramento*, 693 F.Supp. 865 (E.D. Cal.1988). Judge Schwartz deals in that decision with a survey proffered as evidence, which he found insufficient. He deals with quality of documentation. He deals with overall quality of the presentation of evidence. And he deals with the burden of proof. As a court that has appellate jurisdiction over bankruptcy matters in this district, decisions of the United States District Court for the Eastern District of California have precedential value in the bankruptcy court.

**B. Evidence Applicable to these Applications.**

The applicant has not presented sufficient competent, admissible evidence that is relevant to the statutory standard that places the focus upon comparable nonbankruptcy services. Although the burden of proof has not been satisfied by the applicant's evidence, the applicant has asked that judicial notice be taken of evidence in

support of other applications in this court. By taking such judicial notice, the court can act.

Judicial notice is taken of this court's decisions in *In re Power's Mansion Inn*, No. 288–08335–C–11 (Aug. 28, 1989), and *In re Convenience Video Movies, Inc.*, No. 288–00224–C–11 (Sept. 18, 1989), and of four declarations by three partners in prominent Sacramento law firms that are reputed to do excellent work in commercial and financial law, but which do not practice bankruptcy.[6] Those areas of practice are comparable to the services in these chapter 11 reorganization cases.[7] These demonstrate that in the Sacramento community, partners in substantial law firms that are sophisticated in matters of business are regularly compensated at rates between $125 and $200 per hour, depending upon the individual and the matter. Rates in excess of $150 per hour are reserved for the best lawyers. Rates for more junior or less sophisticated lawyers range from $75 to $125 per hour.

The overall performance by counsel in these cases has been disappointing and does not support award of fees at the premium rates that are requested.

**C. The Performance in In re Gire.**

The *In re Gire* chapter 11 case revolves primarily around a single asset—the Fiesta

---

**6.** (1) Alan Perkins, of the law firm of Wilke, Fleury, Hoffelt, Gould & Birney, a prominent Sacramento firm with excellent lawyers, filed in *In re Convenience Video Movies, Inc.*, No. 288–00224–C–11 (Aug. 3, 1989), with hourly rates from $85 to $185.

(2) Andrea Miller, of the law firm of Attia, Bartel, Eng & Torngren, a Sacramento law firm that specializes in securities, commercial, and transactional law with high standing in the community, filed in *In re Valley Core Co.*, No. 288–08610–C–11 (July 20, 1989), with hourly rates from $90 to $175.

(3) Hartley Hansen, of the law firm of Hansen, Boyd, Culhane & Watson, another prominent Sacramento firm that does not practice bankruptcy law, filed in *In re Ameritrust Fin. Corp.*, No. 287–06641–C–11 (July 28, 1989), where named partners charge between $150 and $200 per hour, depending upon the matter, which is consistent with Mr. Hansen's declaration (sponsored by the Law Offices of Melvyn J. CoBen), filed in *In re Fairview Plaza Assoc.*, No. 288–00800–A–11 (April 11, 1988), reciting that in

1988 he was accepting employment at an hourly rate not exceeding $125, which he said was the firm's hourly rate.

**7.** The applicant has also proffered the affidavit of W. Austin Cooper. The declaration, while not relevant to the statutory standard of comparable nonbankruptcy services, reports asking rates ranging from $75 to $185 per hour, which were rates that were then being sought in another application in this court. Rates ranging from $75 to $160 per hour were allowed for the reasons stated in *In re Valley Core Co.*, No. 288–08610–C–11 (Aug. 29, 1989).

The applicant also proffers the declaration of Daniel J. Sullivan, a lawyer who describes his practice as plaintiff's personal injury and criminal law. He says that when he bills hourly, it is at the rate of $165. Plaintiff's personal injury and criminal work are not comparable to bankruptcy reorganization and typically are not billed on an hourly basis. Thus, the nominal hourly rate is not probative of the statutory standard.

Manor Motel in West Sacramento, California. At the time of the filing of the case, the motel had been closed for a substantial period and had been damaged. Debtor owed more than $325,000 to the holders of first and second deeds of trust. Schedule A–2. The case was filed because the holder of the second deed of trust ("Marathon") was proceeding to foreclose and had recorded a notice of sale scheduling a sale to occur on the steps of the Yolo County Courthouse on January 27, 1988. After a creditor moved for relief from the automatic stay, it ultimately was sold for $250,000 in 1989 at the instance of debtor, who has since stipulated to conversion of the case to chapter 7.

### (1) *The Initial Filing.*

There were two significant problems with the schedules, both of which are attributable to counsel.

First, Schedule A–3 lists fifty unsecured claims without priority. Each and every claim is designated, by way of a blanket recitation, as contested and disputed. Creditors are not fairly placed on notice that their claims are contested because the designation is not, as is ordinarily the practice, separately stated as to each claim. It is quite unlikely that every claim could in good faith be contested and disputed.[8] The schedules were prepared by counsel and signed by the debtor on advice of counsel.

Second, the list of twenty largest unsecured creditors includes, in violation of Bankruptcy Rule 1007(d), as the sixth largest creditor, Myron E. Gire, Jr., the debt-

or's son. That list must, according to the plain language of the rule, exclude "insiders":

> [A] debtor in a voluntary chapter 11 reorganization case shall file with the petition a list containing the name, address and claim of the creditors that hold the 20 largest unsecured claims, *excluding insiders*, as prescribed by Official Form No. 9.

Bankr.R. 1007(d) (emphasis supplied). The Bankruptcy Code defines "insider" as including a "relative of the debtor" when the debtor is, as here, an individual. 11 U.S.C. § 101(30)(A)(i). Accordingly, there is no question that the debtor's son is an insider.

Moreover, counsel knew that Myron Gire, Jr., was the debtor's son. A reference to "Conference with Alice Gire and son, Myron Jr" appears on counsel's time sheet for August 28, 1987. Motion For Order Approving And Authorizing Payment Of Interim Compensation Of Attorneys' Fees, Exhibit A, at 1 (July 26, 1989).

As a proximate consequence of this violation of Bankruptcy Rule 1007(d), the debtor's son became a member of the committee of unsecured creditors. This is no minor matter. Such infelicities undermine the integrity of, and tend to bring into disrepute, the entire bankruptcy system by creating an appearance of favoritism. Improperly listing the debtor's son on the list of twenty largest creditors naturally led to his appointment to the creditor's committee as a matter of administrative routine.[9] The

---

8. Ironically, counsel has prepared schedules that contest and dispute counsel's own prepetition claim, which is listed as unknown in amount. That listing raises other problems. First, it cannot be true that the amount was not known—the number of hours had long since been recorded and counsel says that the office-wide billing rate has been $175 per hour for some years. The time records proffered in support of the motion reflect that between August 5 and October 28, 1987, 9.3 hours were recorded by counsel, for which time counsel now wishes to be paid $1,627.50. There was no activity in November and December 1987. The $1,627.50 must have been known when counsel prepared the schedules for the actual chapter 11 filing between January 7 and 15, 1988.

Second, the existence of that prepetition claim may statutorily disqualify counsel from the em-

ployment. In view of the disposition, *infra,* denying the prepetition claim in its entirety so as to preserve counsel's eligibility for post-petition fees, the court need not reach the question of whether counsel's actions in preparing schedules that designate counsel's claim as disputed and contested is a statement that constitutes an admission that the claim is invalid. Fed.R.Evid. 801(a) and (d).

9. It is of no consequence that counsel did not sign the list, that the Clerk of the court (the United States Trustee not having yet been certified in this district) solicited the persons listed and appointed the committee, or that the offending insider did not decline to serve. Counsel prepared the list for the client. It would defy credulity for a lawyer who has been in practice for three decades and who claims to be

entire case was thereby infected with the potential criticism that the fox had been installed in the chicken coop.

The debtor's son might not have been on the list if counsel had, in compliance with Bankruptcy Rules 1007(d) and 9009, prepared it on Official Form No. 9. The official form contains preambular language that makes clear that insiders are not to be listed. Moreover, counsel did not take care to have the debtor sign and verify (or make a declaration pursuant to 28 U.S.C. § 1746), as required by Bankruptcy Rule 1008.

### (2) *Employment of Counsel.*

There is a problem with the employment of counsel and whether counsel was statutorily eligible to be employed. A professional employed to represent the estate cannot hold or represent an interest adverse to the estate and must be a "disinterested" person. 11 U.S.C. § 327(a). The definition of "disinterested" person specifically excludes creditors. 11 U.S.C. § 101(13)(A). This fee application seeks $1,627.50 for 9.3 hours of services that were rendered between August 5 and October 28, 1987, followed by more than two months of inactivity. The actual bankruptcy filing was prepared between January 5 and 15, 1988.

Counsel filed an affidavit in support of the request for employment that recited, in pertinent part:

I, MELVYN J. COBEN, being duly sworn, deposes [sic] and says [sic]:

. . . .

3. Neither I, the firm of MELVYN J. COBEN, a Professional Corporation, nor any member or associate thereof, insofar as I have been able to ascertain, represents any interest adverse to that of the estate or the debtor in matters upon which said firm is to be engaged.

4. Based on the foregoing, I believe that the firm of MELVYN J. COBEN, a

Professional Corporation, is a "disinterested person" within the meaning of section 101(13) of the Bankruptcy Code.

. . . .

LAW OFFICES OF MELVYN J. COBEN

A Professional Corporation

BY: /s/_____
MELVYN J. COBEN

Affidavit Of Proposed Attorney To Be Employed Under General Retainer (Jan. 15, 1988).

The affidavit, strictly construed, is not false—because the crucial, potentially disqualifying factors were not referred to in the affidavit. If paragraph 3 of the affidavit had tracked the statutory formula of section 327(a), it would have used the phrase "holds or represents" rather than "represents" an interest adverse to the estate. 11 U.S.C. § 327(a). By omitting that word, counsel avoided the necessity of disclosing that counsel is a prepetition creditor and that counsel "holds" an interest (i.e. a prepetition claim) adverse to the estate.

The affidavit is on more tenuous ground when it purports to opine that the law firm is a "disinterested" person. A creditor, by statutory definition, cannot be a "disinterested" person. 11 U.S.C. § 101(13)(A). This is not a situation in which a lawyer's creditor status results from prebankruptcy services that were rendered immediately prepetition, with respect to which situations courts have been disposed to recognize a rule of reason that exempts counsel from status as a creditor. Instead, the services in question were rendered some months before bankruptcy and were then followed by a substantial interlude. The services rendered in 1987 were rendered so long before the filing of the bankruptcy as to raise a genuine issue about whether counsel was a disqualified creditor.[10]

---

one of the most experienced bankruptcy lawyers in this district to claim ignorance of the consequences of the improper list.

**10.** As a matter of discretion, the court is electing to deal with the problem by denying the prepetition claim, placing counsel in the same position as if the debt had been forgiven and is doing so

in order that counsel not be disqualified as ineligible to have been employed because of the "disinterested" requirement of 11 U.S.C. § 327(a).

■ It is settled in this district and elsewhere that in applications for employment, the burden is on the person to be employed to come forward and make full, candid, and complete disclosure. *In re Roberts*, 75 B.R. 402, 411–12 (D.Utah 1987) (en banc), *aff'g*, 46 B.R. 815, 839 (Bankr.D.Utah 1985); *In re B.E.S. Concrete Products, Inc.*, 93 B.R. 228, 237 (Bankr.E.D.Cal.1988); *In re Coastal Equities, Inc.*, 39 B.R. 304, 308 (Bankr.S.D.Cal.1984); *In re B.E.T. Genetics, Inc.*, 35 B.R. 269, 273 (Bankr.E.D.Cal. 1983). Negligent omissions do not vitiate a failure to disclose. *In re B.E.S. Concrete Products, Inc.*, 93 B.R. at 237; *In re Coastal Equities, Inc.*, 39 B.R. at 308. There is a distinct possibility that counsel was ineligible for employment *ab initio* in this case.[11] Careful counsel would have disclosed the issue in this case.

### (3) *Attorney Testimony.*

Soon after filing the case, counsel made a Motion For Order Authorizing Sale Of Property Free And Clear Of Liens, seeking court approval of a sale "for no less than $650,000, without buyer in place," pursuant to 11 U.S.C. § 363. The evidentiary support for the motion was some attorney testimony:

I, MELVYN J. COBEN, attorney for debtor, respectfully represent:

. . . .

4. The Debtor intends to solicit an offer to purchase the subject property for an amount not less than $650,000.00.

5. The subject property is encumbered by a deed of trust in first position securing an obligation in favor of Rasamond [Rosamond] Wicks. The amount presently claimed by creditor to be due and owing on said obligation is approximately $95,700.00

6. The subject property is further encumbered by a deed of trust in second position securing an obligation in favor of Marathon Home Loans. The amount presently claimed by creditor to be due and owing on said obligation is approximately $235,000.00.

7. The debtor proposes to sell the property free and clear of liens, and to pay directly from the escrow the amounts this Court finds are due and owing the first and second trust deed holders, and the administrative claims of this Chapter 11, if any.

8. The debtor is informed and believes that the subject property has a market value for quick sale of no less than $600,000.00 and no greater than $700,000.00 for fair market value at this time. Than [That] an offer, if received, for $650,000.00 or more is in the best interest of the creditors of the estate and the debtor is willing to realize less than full value.

. . . .

LAW OFFICES OF MELVYN J. COBEN

A Professional Corporation

BY: /s/_____

MELVYN J. COBEN

Memorandum Of Points And Authorities In Support Of Motion For Order Authorizing Sale Of Property Free And Clear Of Liens (Feb. 2, 1988). After more than a year of marketing the property, it sold for $250,000 cash.[12]

Attorney testimony is disfavored in federal courts. It is not based on personal knowledge. It places counsel in the position of making counsel's credibility an issue in the case. In this instance, counsel placed himself in the position of virtually promising the court and the creditors that he would be able to produce a $650,000 sale and now needs to explain why the price a year later was $250,000. Careful counsel do not place themselves in such a position.

---

11. The court is not holding that counsel was, as a matter of law, ineligible for employment in this case. The record is not sufficiently developed to draw such a conclusion—a determination that would justify denial of the entire fee request. *In re B.E.S. Concrete Products, Inc.*, 93 B.R. at 237. There is, however, genuine doubt that counsel was eligible for employment. The appropriate way to deal with the problem at this juncture is to deny the prepetition claim, with prejudice.

12. The court is mindful that counsel obtained an order to approve a hypothetical sale in advance.

### (4) *Monthly Operating Reports.*

Chapter 11 debtors are required to make regular reports, including monthly operating reports, reports of taxes, and reports of funds on deposit, so that parties in interest may know what is transpiring. Monthly operating reports, for example, entail completing a comparatively simple form. Where there are no receipts and expenditures, the practice is to enter zeroes on each line. Debtor did not regularly make the requisite reports and filed most of the reports only after a court order to do so.

At one point counsel sought authority not to file monthly operating reports. The justification was:

> In order for the Debtor to prepare Monthly Operating Reports it would be necessary for the Debtor to employ a bookkeeper. Given that the only expenditures made by the Debtor have been minor utiliuty [sic] bills in sustaining the motel, the generation of Monthly Operating Reports does not warrant the additional expense of a bookkeeper.

Ex Parte Motion For Authority Not To File Monthly Operating Reports, at 1–2 (July 15, 1988). The motion was denied because no bookkeeper is needed to report minor utility bills. The court noted in its denial of the motion that "Monthly reports must be filed." They were not thereafter regularly made.

### (5) *The 11 U.S.C. § 506(c) Claim.*

Counsel seeks to have Marathon pay up to $25,000 of counsel's fees on a theory that, pursuant to 11 U.S.C. § 506(c), Marathon was benefited by the services of counsel. When the property was sold for $250,-000, counsel held back $25,000 on a section 506(c) theory and paid $58,316.93 to Marathon on its $235,000 claim. Whether that $25,000 may be used as a source of funds to pay counsel is also at issue in this motion.

Counsel's theory is that his services protected Marathon's interests as holder of a second deed of trust from being wiped out upon a foreclosure by the holder of the first deed of trust, which foreclosure was stopped by the filing of this bankruptcy case. Counsel says,

> Prior to filing its Petition For Rosamond Wicks [for Alice Gire?], the holder of the First Deed of Trust on the property was proceeding to foreclose on said property. Neither holder of the Second Deed of Trust or any other encumbrance on the property had attempted to cure the default of the First.

Motion For Order Approving And Authorizing Payment Of Interim Compensation Of Attorney's Fees, at 3 (July 26, 1989).

Counsel has the facts backwards. It was Marathon that was proceeding to foreclosure prior to the filing of the petition. Rosamond Wicks, the holder of the first deed of trust, had filed no notice of default and had made no prebankruptcy move of record to proceed toward foreclosure. In other words, this bankruptcy case was filed for the purpose of stopping Marathon from foreclosing, and counsel, relying upon a misstatement of facts, proceeded to demand that Marathon pay him $25,000 for his efforts in forestalling the exercise of Marathon's rights.[13] When the misstatement was brought to counsel's attention, counsel nevertheless forged ahead.

Counsel also represented to the court that Marathon had stipulated that counsel be paid its fees from the $25,000 that was withheld:

> Further, Marathon has agreed by stipulation to permit Movant to be paid its fees from the proceeds.

Points And Authorities In Support Of Motion For Attorneys Fees, at 4 (July 26, 1989).

Marathon did not so stipulate and, in the stipulation, spelled out that Marathon waived no rights to object to the reasonableness of fees claimed by counsel against the $25,000 that was being held. Stipulation Re Proceeds Of Sale And Order Ap-

---

**13.** The facts relating to this matter are more fully set out in Memorandum On Motion For Payment Of Costs And Expenses Pursuant to 11 U.S.C. § 506(c), *In re Gire,* (Aug. 29, 1989). The term "Marathon" is used herein as a proxy for the holders of the second deed of trust on that loan that was originated by Marathon, but in which Marathon now claims no interest.

proving, at 2–3 (May 26, 1989). Marathon informed counsel of the inaccurate statement regarding the stipulation. Response To Application Of Counsel For Debtor For Payment Of Interim Compensation, at 4 (Aug. 10, 1989). Nevertheless, counsel forged ahead.

### (6) The Fee Application.

■ This fee application seeks an award on account of unpaid prepetition fees and seeks to have them treated as administrative expenses of the estate. The sum of $1,627.50 is claimed for services that were performed before the end of October 1987, some two and one-half months before the bankruptcy papers were prepared and filed. Counsel is listed as a prepetition creditor.

As noted above, status as a creditor probably makes counsel statutorily ineligible for employment in this bankruptcy case because a creditor is, by statutory definition, not a "disinterested" person.

The only effective way to remove the disability is to eliminate the status as creditor. Counsel should have accomplished that by not requesting compensation on that prepetition claim. Since counsel has not done so, the court will do it by denying, with prejudice, all compensation for services rendered during the period August 5 through October 28, 1987.

### (7) Necessity of Services.

■ The United States Trustee argues that, once it became apparent that the property was overencumbered, most of the ensuing services were unnecessary. Most of the fees thereafter, it is argued, flunk the statutory requirement that the fees be for "actual, necessary services" rendered. 11 U.S.C. § 330(a) (emphasis supplied). This analysis is further supported by the filing of a plan that, on its face, had little prospect of success. Debtor then effectively withdrew the plan by stipulating to conversion to chapter 7.

This objection has considerable merit. It was apparent in December 1988 that the motel was overencumbered and that a successful plan of reorganization would be unlikely. Nevertheless, there was still some chance. The appropriate adjustment is to treat one-half of the hours in 1989, i.e. 33.45 hours (Mr. Coben .5 hours; Mr. Franchi 1.45 hours; Ms. Hill 31.5 hours), as necessary.

### D. The Performance in In re B.E.S. Concrete Products, Inc.

The committee of unsecured creditors in In re B.E.S. Concrete Products, Inc., engaged counsel in June 1988 at the point at which a major controversy was coming to a head more than seven months after the case was filed. Counsel asks for compensation of $10,456.25, reflecting services by Mr. CoBen (13.75 hours) and by Ms. Hill (46.00 hours).

The In re B.E.S. Concrete Products, Inc., application is inaccurately captioned "Hearing On Application Of Cindy Lee Hill For Order Authorizing Payment Of Interim Compensation Of Attorneys' Fees And For Order Of Appointment Nunc Pro Tunc" even though the applicant really is the Law Offices of Melvyn J. CoBen. The words "Hearing On" in the caption appear to be a mistake.

### (1) The Application for Employment.

■ Counsel's initial application for employment was denied without prejudice because counsel failed to present the declaration required by Bankruptcy Rule 2014, which requires that the professional disclose all pertinent connections. Counsel admits that it was inadvertence. In re B.E.S. Concrete Products, Inc., Application, at 2 (Feb. 23, 1989). The need to resubmit because of the failure to comply with Bankruptcy Rule 2014 created work for the court that would not have been necessary if counsel had been meticulous.[14]

---

**14.** Nunc pro tunc orders are strongly disfavored. Moreover, no nunc pro tunc order is needed to permit compensation for the 19.75 hours of services that were rendered in the twenty-six days before the order approving employment was signed. Counsel applied for employment in good faith, albeit sloppily, within four days of the initial services. The initial services were at the First Meeting of Creditors over which counsel had little control. In the context of the timing of the events and services, this situation probably fulfills the criteria of satisfactory explanation and significant benefit to the estate. In re THC Fin. Corp., 837 F.2d 389

## (2) *Argument in Support of Officewide Rate.*

The argument in support of applicant's claim that all attorneys, including junior attorneys, should be compensated at the hourly rate of the most experienced attorney is set forth above at pages 2–9 and is also probative of the quality of representation. Declaration of Melvyn J. CoBen, *In re B.E.S. Products, Inc.* (Feb. 23, 1989).

## (3) *Price Fixing Argument.*

Another argument that is probative of the quality of representation is the applicant's price fixing argument, which, in its entirety, says:

> *Goldfarb v. State Bar of Virginia,* 421 U.S. 773 [95 S.Ct. 2004, 44 L.Ed.2d 572] (1975) prohibited the establishment of fee schedules. A review of *Goldfarb* clearly establishes a policy against price fixing. Movant is concerned that filing the types of declarations apparently required by *Gianulias* would encourage the establishment of the same type of price fixing previously found illegal by the U.S. Supreme Court in *Goldfarb.*

Supplemental Points And Authorities In Support Of Motion For Attorneys Fees, *In re B.E.S. Concrete Products, Inc.* (April 17, 1989).

No analysis is provided to explain why a truthful affidavit from an attorney about that attorney's charges is price fixing.[15] There is no explanation of why the requirement of evidence of prevailing rates for comparable nonbankruptcy services is the functional equivalent of a mandatory minimum fee schedule. Nor is there any description of what the mechanism is for disciplining cheaters who would charge too little or of the effectiveness of the mechanism and how such a mechanism compares with the Virginia Bar's apparently credible threat of disbarment.

## (4) *Discrimination Argument.*

Another argument that is probative of the quality of representation is, as stated in its entirety:

> Further, the establishment of minimum or maximum fees will inevitably and detrimentally impact minority women and young lawyers in the profession. Generally, the operating expenses of a law office are fixed, the only variable being wages paid to the associate attorneys. Clearly, if the Court establishes a "lodestar rate" for an attorney which is insufficient to support both that attorney's wages and office overhead, the employer has two choices: first, to cut the attorney's wages or second, to cut the attorney and hire more experienced counsel who can be billed at a higher rate.
>
> As a vast majority of women, young, and other minority lawyers have entered the profession within the past 10 years, such a result would result in discrimination against them, either in determining their wages or hiring practices.

Supplemental Points And Authorities In Support Of Motion For Attorneys Fees, *In re B.E.S. Concrete Products, Inc.,* at 2 (April 17, 1989). No further analysis is provided. No authorities are cited.

This argument is also placed in perspective by the testimony of Ms. Hill regarding the fee application of this applicant in *In re Wieck,* No. 287–04567–C–11, of which the court takes judicial notice. It is evident that $175 per hour is not necessary to cover her salary and overhead.[16] Ms. Hill testified in open court that during the period covered by these fee applications, the Law Offices of Melvyn J. CoBen paid her

---

(9th Cir.1988). Moreover, it falls within the *de minimis* exception for short "gap" periods. *See In re B.E.S. Concrete Products, Inc.,* 93 B.R. at 232 n. 5.

**15.** Although affidavits are a likely source of relevant evidence, this court actually left the way open for any type of relevant evidence that could be mustered.

**16.** While the economics of a specific law firm are not ordinarily pertinent to a lodestar-type analysis, the door has been opened by the suggestion that not compensating Ms. Hill's services at $175 per hour would not cover her salary and overhead. And it has been opened by the following declaration of Mr. CoBen:

> 3. In 1962 I paid my secretary approximately $300.00 per month, which was the going rate at that time. I paid approximately $250.00 for an electric typewriter and approximately thirty five cents a square foot for office space.
> 4. Currently, I pay secretaries between $1,400.00 and $1,600.00 per month. I.B.M. charges $750.00 for its basic electric typewrit-

an annual salary beginning at $28,000 and ending at $34,000 (with no bonus). As of June 1, 1989, she was paid $36,600 per year. During the same period, she was billing at a monthly average rate in excess of 191 hours per month.[17] In other words, at $175 per hour, the services of Ms. Hill are being billed at an annual rate in excess of $401,000, while she is being paid between 5 and 10 percent of that amount.

### E. Individual Rates for These Applications.

■ Based upon the records in the cases now before the court, and upon the court's observation of the performance of counsel, the appropriate hourly rates that will be awarded are as follows: Mr. CoBen, $135;[18] Mr. Franchi, $125; Ms. Hill, $95; and Mr. Khoo, $75. These rates will be applied, with one exception,[19] to the hours set forth below.

The fee award will be calculated on the basis of the hourly rates and the adjusted hours allowed.

In *In re Gire*, no time is allowed for services in August, September, and October 1987. These were unbilled prepetition services rendered substantially in advance of the filing of the case and are not the proper subject of a fee application. Moreover, they probably represent a prepetition, unsecured claim that should have rendered counsel ineligible for employment. All services rendered in 1988 will be allowed:

| | | | |
|---|---|---|---|
| Mr. CoBen | 23.80 hours × | $135.00 = | $3,213.00 |

| | | | |
|---|---|---|---|
| Mr. Franchi | 3.00 hours × | 125.00 = | 375.00 |
| Ms. Hill | 32.80 hours × | 95.00 = | 3,116.00 |
| Mr. Khoo | 41.80 hours × | 75.00 = | 3,135.00 |
| | TOTAL | | $9,839.00 |

For services in 1989, one-half will be allowed for the reason set forth above:

| | | | |
|---|---|---|---|
| Mr. CoBen | .50 hours × | $135.00 = | $ 67.50 |
| Mr. Franchi | 1.45 hours × | 125.00 = | 181.25 |
| Ms. Hill | 31.50 hours × | 95.00 = | 2,992.50 |
| | TOTAL | | $3,241.25 |

Accordingly, $13,080.25 will be allowed as compensation in *In re Gire*.

Turning to *In re B.E.S. Concrete Products, Inc.*, the calculation is less complicated, as the court will allow the full amount of time claimed. As noted above, Mr. CoBen will be allowed $175 per hour because the court expressly approved that rate in the order authorizing the employment. The fees are:

| | | | |
|---|---|---|---|
| Mr. CoBen | 13.75 hours × | $175.00 = | $2,406.25 |
| Ms. Hill | 46.00 hours × | 95.00 = | 4,370.00 |
| | TOTAL | | $6,776.25 |

Accordingly, the sum of $6,776.25 will be allowed in *In re B.E.S. Concrete Products, Inc.*

This memorandum constitutes findings of fact and conclusions of law.

An appropriate order will issue.

---

er, I pay $1.55 per square foot for office space.
Declaration In Support Of Reply And Support Of Motion For Attorneys Fees By Melvyn J. CoBen, Esq., at 1–2 (April 17, 1989).

·17. 
October 1988 — 200 hours (approximate);
November 1988 — 200 hours (approximate);
December 1988 — 170 hours (approximate);
January 1989 — 196 hours;
February 1989 — 168 hours;
March 1989 — 218 hours;
April 1989 — 188 hours.

Testimony of Cindy Lee Hill as supplemented by letter of Cindy Lee Hill dated June 19, 1988, re Fee Applications of the Law Offices of Melvyn J. CoBen, cases Nos. 287–04567–C–11 and 287–05895–C–11 (ordered filed in each case).

18. This rate is below what the court would have thought, at first blush, appropriate of a lawyer of his education and experience. Nevertheless, this court cannot allow a higher rate in fairness to the many lawyers who do conscientiously follow the rules and in an effort to be consistent with the precept that good fees are to be awarded only for good work.

19. The court's order approving the employment in *In re B.E.S. Concrete Products, Inc.*, specifically provided that the $175 hourly rate stated in the application for employment would be applicable only to the services of Mr. CoBen himself. In view of that provision, the court regards itself bound by that rate for Mr. CoBen's 13.75 hours in *In re B.E.S. Concrete Products, Inc.*, (but only in that case) even though the court is now firmly convinced that the $175 hourly rate is too high and that it was improvident for the court to have approved it. 11 U.S.C. § 328(a).